# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ERIC VIGIL and KIMBERLY VIGIL, Individually,**
**as Personal Representatives of the Estate of**
**JUSTIN VIGIL, and as Next Friends of**
**JACOB VIGIL, and JUAN MOYA and**
**JOSIE MOYA, Individually, and Personal**
**Representatives of the Estate of JACOB MOYA,**
**and as Next Friends of JUSTINA MOYA,**

        **Plaintiffs,**

**vs.**                               **No. CIV 06-0212 RB/WDS**

**BURLINGTON NORTHERN AND SANTA FE**
**RAILWAY CO., a Delaware Corporation and**
**THE NATIONAL RAILROAD CORP., a/k/a**
**AMTRAK,**

        **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

      **THIS MATTER** came before the Court on Defendants' Motion to Strike Affidavit of Allen Haley and to Exclude Opinions (Doc. 124), filed on May 7, 2007; Defendants' Motion to Strike Second Affidavit of Allen Haley and to Exclude New Opinions (Doc. 136), filed on May 24, 2007; Defendants' Motion for Summary Judgment (Federal Preemption) (Doc. 74), filed on March 9, 2007; Plaintiffs' Cross Motion for Sanctions Against Defendants (Doc. 89), filed on April 6, 2007; Defendants' Motion for Summary Judgment: Federal Preemption of Claims Regarding Crew Training and Train Event Recorders (Doc. 99), filed on April 9, 2007; Defendants' Motion for Partial Summary Judgment on the Driver's Negligence *Per Se* and on Plaintiffs' Claim that the Train Crew Failed to Maintain a Proper Lookout or Take Action to Avoid the Collision (Doc. 72), filed on March 9, 2007; Defendants' Motion for Summary Judgment on Plaintiffs' Negligence and Punitive Damage Claims (Doc. 96), filed on April 9, 2007; and Defendants' Brief in Support of

Their Objections to Plaintiffs' Designation of Claims and Witnesses in the Pretrial Order (Doc. 159), filed on July 3, 2007.  Jurisdiction arises under 28 U.S.C. § 1332.

The Court, having considered the motions, briefs, record, and relevant law, and being otherwise fully advised, finds: Defendants' Motions to Strike should be granted as to Mr. Haley's opinions regarding the integrity of data downloaded from the event recorders, the effectiveness of the event recorders, the responsibility of BNSF and Amtrak for the actions of the Amtrak crew, and denied as to Mr. Haley's opinions concerning whether the train crew properly operated the whistle; a decision on the admissibility of Mr. Haley's opinion on whether dangerous conditions existed at the crossing that warranted modification of the crossing is reserved pending a hearing pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); Defendants are directed to file a motion identifying any documents relied upon by Mr. Haley that are allegedly covered by 23 U.S.C. § 409 or 49 U.S.C. § 20903 by August 10, 2007; and  Defendants' request for costs with respect to their Motions to Strike is denied at this time, subject to renewal at the conclusion of this litigation.

The Court further finds: Defendants' Motion for Summary Judgment (Federal Preemption) should be granted as to Plaintiffs' claims relating to the speed of the train and the adequacy of the whistle and denied as to claims that the train crew failed to properly sound the whistle; Plaintiffs' Cross Motion for Sanctions Against Defendants should be denied; Defendants' Motion for Summary Judgment: Federal Preemption of Claims Regarding Crew Training and Train Event Recorders should be granted; Defendants' Motion for Partial Summary Judgment on the Driver's Negligence *Per Se* and on Plaintiffs' Claim that the Train Crew Failed to Maintain a Proper Lookout or Take Action to Avoid the Collision should be granted; and Defendants' Motion for Summary Judgment on Plaintiffs' Negligence and Punitive Damage Claims should be granted on Plaintiffs' claims for punitive damages and Plaintiffs' claims that Defendants had authority to close the North Farm Road

2

crossing or the responsibility to maintain North Farm Road and denied on the issues of whether the train crew properly operated the whistle; and a decision on whether Defendants are entitled to summary judgment on the issue of whether dangerous conditions existed at the crossing that warranted modification of the crossing is reserved. Defendants' objections to Plaintiffs' designation of witnesses in the Pretrial Order were resolved by a stipulated order filed contemporaneously herewith.  Defendants' objections to Plaintiffs' designation of claims in the Pretrial Order are overruled to the extent stated herein.

**I.      Facts.**

This wrongful death and loss of consortium action stems from a tragic collision between an Amtrak train and a 1998 GEO Tracker sport utility vehicle ("SUV").  The following statement of facts is set forth in the light most favorable to Plaintiffs, with all reasonable inferences from the record drawn in their favor.  *See Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006).

On the afternoon of March 21, 2003, fifteen-year-old Jacob Moya drove the SUV southbound on New Mexico Highway 313 ("SR 313") in Sandoval County, New Mexico.  Thirteen-year-old Justin Vigil was the only passenger.  SR 313 runs parallel to railroad tracks, which are located to the east of the roadway.  The boys were on their way to tend cattle on Sandia Pueblo land on the east side of the tracks.

At about 3:35 p.m., the SUV turned east onto North Farm Road, a dirt road that crosses the tracks.  ([Doc. 73] Defs. Ex. A, " Arnold Aff.")  The SUV was struck by a southbound Amtrak train. (Arnold Aff.)  Jacob Moya and Justin Vigil died in the collision.  (Arnold Aff.)

The North Farm Road railroad crossing predates automobile traffic.  ([Doc. 86] Pls. Resp. Br., Exs. B and C.).  On the day of the collision, there was a stop sign located on the west side of

the North Farm Road railroad crossing that faced eastbound traffic approaching the crossing. (Arnold Aff.)  There was also a crossbuck sign posted on the same pole, below the stop sign. (Arnold Aff.)  The stop sign and the current crossbuck sign were installed after a train-vehicle collision in March 1996.  (Arnold Aff.)  The stop sign and crossbuck sign were clearly visible to vehicles approaching the North Farm Road crossing from Highway 313.  (Arnold Aff.)

At the time of the collision, Plaintiffs Eric Vigil and Kimberly Vigil were on North Farm Road on the east side of the tracks to the south of the crossing.  ([Doc. 128] Pls. Ex. 2, "Arnold Report.")  Eric and Kimberly Vigil saw the SUV approach the crossing.  (Arnold Report.)  Mr. Vigil testified in his deposition that he had gotten into his truck to start it and turn into the pasture gate, when he "looked through the windshield, they [Justin Moya and Jacob Vigil] were on top of the track, and boom, they got hit."  ([Doc. 128] Pls. Ex. 3, E. Vigil Dep. 45.)  Mr. Vigil did not hear the train whistle blowing prior to the impact; he only heard the whistle when the train was on top of the SUV.  (Vigil Dep. 45.)

Before the accident, Cynthia Herrera was driving southbound on SR 313, behind the SUV. ([Doc. 75] Defs. Ex. C, "Herrera Aff.")  Ms. Herrera could hear the whistle and see the headlight of the train from approximately a quarter of a mile away from the North Farm Road turnoff. (Herrera Aff.)  Ms. Herrera slowed down when the SUV stopped to turn left.  (Herrera Aff.)  After northbound traffic passed, the SUV turned east onto North Farm Road.  (Herrera Aff.)  As the SUV turned east onto North Farm Road, Ms. Herrera could hear the train whistle inside her vehicle with the windows closed.  (Herrera Aff.)

After the SUV turned onto North Farm Road, Ms. Herrera proceeded southbound and watched the SUV in her driver's side mirror.  (Herrera Aff.)  Ms. Herrera recalled that the SUV did not come to a stop at the stop sign for the railroad crossing.  (Herrera Aff.)  Instead, the SUV

4

proceeded onto the railroad track, moving slowly forward onto the track where it collided with the train.  (Herrera Aff.)

Ms. Herrera observed the debris from the SUV thrown away from the site, as well as the bodies of the two persons in the SUV as they were ejected from the vehicle.  (Herrera Aff.)  According to Ms. Herrera, the whistle on the train was blowing the whole time, and the train could be clearly seen in the approach to the crossing as there were no obstructions in either direction.  (Herrera Aff.)  Ms. Herrera "vividly remembers" the events leading up to the accident.  (Herrera Aff.)

Mike Avila was traveling north on SR 313.  (Arnold Aff.)  Mr. Avila recalled he almost had to stop as the SUV pulled out in front of him to turn onto North Farm Road.  (Arnold Aff.)

James Steiner was the first engineer on the train, which was traveling from La Junta, Colorado to Albuquerque, New Mexico.  ([Doc. 90] Pls. Ex. 2, "Steiner Dep." 14.)  Mr. Steiner has been operating Amtrak trains on the same route since 1988.  (Steiner Dep. 31; 38.)  At the time of the accident, Mr. Steiner was trained, qualified and certified as a locomotive engineer.  ([Doc.97, Defs. Ex. B, "Nerkowski Aff.")

Mr. Steiner testified in his deposition that the train lights were on, the bell was ringing, and the horn[1] was blowing as the train approached the North Farm Road crossing.  ([Doc. 75] Defs. Ex. A; "Steiner Dep." 107-08; 116-18.)  The whistle, bell and lights were checked before the train left La Junta earlier that day and were found to be operational.  ([Doc. 97] Defs. Ex. C, "Estep Dep." 23-25.)

According to Mr. Steiner, the SUV appeared as if it were going to stop, but it continued onto

---

[1] Mr. Steiner testified in his deposition that, with respect to locomotives, the terms "whistle" and "horn" refer to the same device and the terms are interchangeable.  ([Doc. 97] Steiner Dep. 102.)

the tracks without stopping.  (Steiner Dep. 104.)  The distance between the tracks and the road was about 50 yards.  (Steiner Dep. 104.)  The SUV did not stop, but rolled onto the tracks at a very slow speed.  (Steiner Dep. 104.)  The SUV "never really stopped," but "coasted out in front of" the train. (Steiner Dep. 120.)  The SUV was "continuously moving at real slow speed onto tracks."  (Steiner Dep. 161).

Mr. Steiner realized the SUV was not going to stop seconds before the collision.  (Steiner Dep. 161.)  The SUV may have done a "California roll," but it never came to a stop.  (Steiner Dep. 161.)  Mr. Steiner applied the emergency braking system "seconds" before the collision.  (Steiner Dep. 106; 120.)  Mr. Steiner continued to sound the whistle repeatedly as he placed the train "in emergency."  (Steiner Dep. 121.)

Mr. Steiner testified in his deposition that the train was traveling at 79 miles per hour ("mph") or slower, before he applied the emergency braking system.  (Steiner Dep. 107; 193.)  The track was straight, and Mr. Steiner could see a mile or two down the track.  (Steiner Dep. 158.)  The train had thirty cars.  (Steiner Dep. 159.)  For a train that size, traveling at that speed, a regular stop required about a mile and an emergency stop required a half a mile or more, depending on tonnage. (Steiner Dep. 159.)   According to Mr. Steiner, Defendant BNSF is responsible for track maintenance.  (Steiner Dep. 126.)

Lonnie Estep was the second train engineer at the time of the accident.  (Steiner Dep. 14-15; 68.)  Mr. Estep was trained, qualified and certified as a locomotive engineer at the time of the accident.  (Nerkowski Aff.)  Mr. Estep testified in his deposition that Mr. Steiner started sounding the whistle and ringing the bell right at the whistle board, which was 2,500 feet from the crossing. ([Doc. 75] Def. Ex. B, "Estep Dep. 48.")  The whistle board reminds the engineer to sound the whistle.  (Steiner Dep. 107.)  The weather was clear and visibility was good.  (Estep Dep. at 49.)  Mr.

Estep first saw the SUV on North Farm Road, between the highway and the stop sign.  (Estep Dep. 49; 59.)

Mr. Estep recalled that the SUV was moving slowly and appeared that it would stop, but it never came to a stop and entered the crossing.  (Estep Dep. 49.)  The train was traveling at 79 mph, which was the authorized speed for that section of track.  (Estep Dep. 25; 47.)  The SUV traveled eastbound on North Farm Road at 3 or 4 mph and looked as if it would stop.  (Estep Dep. 58.)

Joseph Tabor was the conductor on the train at the time of the collision.  ([Doc. 129] Pls. Ex. 12, "Tabor Dep.")  Vernon Cox was the line brakeman on the train on the day in question.  (Steiner Dep. 128.)  Mr. Tabor testified in his deposition that he directed Mr. Cox to inspect the train after the accident and Mr. Cox inspected the train as directed.  (Tabor Dep. 103-104.)  According to Mr. Tabor, it would be a rule violation for the engineer to take his eyes off a forward-looking direction even for a split second.  (Tabor Dep. 103-104.)  Mr. Tabor did not recall saying anything about brake problems with the train.  (Tabor Dep. 105.)

The crossing had ruts and potholes and was covered with loose stones and gravel.  ([Doc. 128] Pls. Ex. 3, "E. Vigil Dep. 73.")  The day after the accident, Eric Vigil observed railroad employees shoveling dirt and covering up the holes.  (E. Vigil Dep. 73-74.)  Kimberly Vigil testified in her deposition that railroad employees were at the scene shoveling dirt soon after the accident, while the boys' bodies were still on the ground.  ([Doc. 129] Pls. Ex. 15, "K. Vigil Dep. 23.")

Plaintiff Juan Moya stated in an affidavit that Jacob Moya always honored the rules of the road and traffic statutes of the State of New Mexico.  ([Doc. 90] Pls. Ex. 14, "Moya Aff.")  Mr. Moya additionally stated that it was Jacob Moya's habit to stop for stop signs and yield to oncoming traffic when driving a motor vehicle.  (Moya Aff.)

New Mexico State Police Officer Ben Arnold investigated the accident.  (Arnold Aff.)

Officer Arnold determined that the lights, bells, and whistle on the train were working properly. (Arnold Aff.)  There were no obstructions near the crossing that would have prevented the driver of the SUV from seeing the train on the approach to the crossing.  (Arnold Aff.)  Officer Arnold stated in his affidavit that there were numerous music CDs scattered in and around the SUV and the volume setting on the stereo was at 3/4 of the maximum.[2]  (Arnold Aff.)  All the windows on the SUV were tinted extremely dark.  (Arnold Aff.)

Officer Arnold wrote that the railroad crossing was indicated by two signs, one facing approaching traffic on each side of the tracks.  (Arnold Aff.)  The signs consisted of a red stop sign, and below the stop sign on the same pole, was a white sign containing a large black "X" with an "R" on each side of the "X" to indicate a railroad crossing.  (Arnold Aff.)  The signs were clearly visible to vehicles approaching the crossing from the west on North Farm Road from SR 313, with nothing obstructing the line of sight.  (Arnold Aff.)

Officer Arnold observed no skid marks or tracks indicating that the SUV tried to stop. (Arnold Aff.)  In Officer Arnold's opinion, the accident was caused by the driver of the SUV, who failed to yield the right-of-way to the train and did not stop at the crossing despite the stop sign, and the train engineers were not at fault.  (Arnold Aff.)

Phil Nerkowski is Road Foreman of Engines and Designated Supervisor of Locomotive Engineers for Amtrak, based in Albuquerque.  ([Doc. 127] Pls. Ex. 5, "Nerkowski Dep." 8; [Doc.97] Defs. Ex. B, "Nerkowski Aff.")  Mr. Nerkowski has worked for railroads since 1978, and has been a Road Foreman of Engines since 1991.  (Nerkowski Dep. 7-8; 34-35.)

In his capacity as Road Foreman of Engines, Mr. Nerkowski has downloaded data from train

---

[2] Juan Moya testified in his deposition that there was nothing left of the vehicle after the accident except for a piece of sheet metal. ([Doc. 117] Defs' Ex. A.)

event recorders since 1991. (Nerkowski Dep. 34-35.) Event recorders operate in a manner similar to airplane "black boxes" in that they continuously record data during a trip.[3] Mr. Nerkowski performs between 100 to 150 downloads per year and has undergone special training on how to download data from event recorders. (Nerkowski Dep. 35.) Mr. Nerkowski trains others on "the basics" of how to perform downloads of event recorders and is proficient at evaluating the information. (Nerkowski Dep. 36.)

Mr. Nerkowski was notified of the accident shortly after it occurred, and he proceeded to the scene to investigate. (Nerkowski Dep. 41-43.) Mr. Nerkowski downloaded data from the event recorders onto PC cards and measured the No. 2 wheels on the right side of the lead and second locomotives.[4] (Nerkowski Dep. 43-44.) The wheel size on AM-195 was measured at 39.75 inches in diameter, and the wheel size on AM-23 was measured at 37.35 inches in diameter. (Nerkowski Dep. 79.) Mr. Nerkowski did not download the data from the other two locomotives on the train. (Nerkowski Dep. 34; 88.)

The event recorders for AM-195 and AM-23 recorded all the information required by federal regulations, including the speed of the train, its direction of motion, time, distance, throttle positions, brake applications, and operations. (Nerkowski Aff.) The event recorders on AM-195 and AM-23 were equipped with a tamper-resistant device to prevent the data from being altered. ("Nerkowski Dep.)

On the evening of March 21, 2003, Mr. Nerkowski copied the data onto three sets of

---

[3] Federal regulations define an "event recorder" as a device that "(1) records train speed, hot box detection, throttle position, brake application, brake operations, and any other function the Secretary of Transportation considers necessary to record to assist in monitoring the safety of train operation, such as time and signal indication; and (2) is designed to resist tampering." 49 U.S.C. § 20137.

[4] Defendants refer to the lead locomotive as AM-195, and the second locomotive as AM-23. These terms are utilized herein.

diskettes and printed out three copies of the data in his office in Albuquerque.  (Nerkowski Dep. 83-84; 86.)  Mr. Nerkowski sent a set of diskettes and printout via FedEx to the BNSF claims office and to the Amtrak claims office.  (Nerkowski Dep. 86.)  Mr. Nerkowski kept a set of diskettes and printout for his file.  (Nerkowski Dep.)

On February 1, 2007, Mr. Nerkowski printed out another copy of the data with new software in preparation for his deposition.[5]  (Nerkowski Dep. 104.)  For the February 1, 2007 printout, Mr. Nerkowski tried to adjust the date, time and wheel size.  (Nerkowski Dep. 104-05.)  The time and wheel size inputted affects the accuracy of the time and distance values shown on the printed table.  (Nerkowski Dep. 102.)  Only the time, date, and wheel size can be adjusted.  (Nerkowski Dep. 105; 112-113.)  A change in the date and time only changes the date and time on the printout, not the other data on the printout.  (Nerkowski Dep. 145.)

When he prepared the February 1, 2007 printout, Mr. Nerkowski adjusted the wheel sizes to the measured sizes because the newer software program defaults to 39 inch wheels if it is not adjusted.  (Nerkowski. Dep. 111.)  Both event recorders had incorrect times and dates.  (Nerkowski Dep. 68; 144.)  The time and dates on the event recorders for AM-195 and AM-23, which were GE locomotives, were off due to a technical error in the event recorders.  (Nerkowski Dep. 68.)  During the time period of the accident, "GE locomotives were experiencing a date and time glitch in the transfer of information . . . to the data recorder, which affected time and date only." (Nerkowski Dep. 69.)

Generally, data recorded on a lead locomotive and a second locomotive should be identical.  (Nerkowski Dep. 90.)  However, a one-mph variance could occur due to differences in wheel size.

---

[5] Mr. Nerkowski's deposition was taken on February 8, 2007.  ([Doc. 127] Pls' Ex. B.)

(Nerkowski Dep. 90.)  Train wheel size decreases over time due to wear and tear.  (Nerkowski Dep. 80.)

Mr. Nerkowski testified in his deposition that the printouts showed AM-195 was traveling at 78 mph and AM-23 was traveling at 79 mph before the emergency brakes were applied. (Nerkowski Dep. 91.)  After the emergency brakes were applied, the printout showed AM-195 was traveling at 58 mph, and AM-23 was traveling at 63 mph.  (Nerkowski Dep. 92.)  According to Mr. Nerkowski, the printouts showed that AM-195 was blowing its whistle at 15:38:34 through 15:38:54.  (Nerkowski Dep. 100.)

The printouts indicate that the whistle on AM-195 was operated before and after the emergency brakes were applied.  ([Doc. 128] Pls. Exs. 1 and 6.)  The data table indicates that the whistle was operated from 15 seconds before the emergency brakes were applied.  ([Doc. 128] Pls. Ex. 6.)

On December 18, 2006, Defendants produced a CD containing the downloaded data for AM-195 and AM-23 to Plaintiffs.  ([Doc. 127] Defs. Ex. D.)

Plaintiffs retained Allen Haley, Jr., Principal and Senior Rail Consultant of Strategic Transportation Services, to serve as an expert witness.  Mr. Haley describes himself, inter alia, as a "multi-talented manager experienced in rail transportation" with "[o]ver 28 years experience in railroad operations, transportation consulting, track and equipment maintenance, management, labor relations and in working with regulatory agencies."  ([Doc. 133] Pls. Ex. A, "Haley Resume".)

Mr. Haley has a high school diploma, an incomplete semester of college education, one week of classroom training in track maintenance at the University of Wisconsin, on-the-job training on the use of event recorders to investigate accidents, and other training relating to railroads and track safety standards.  ([Doc. 125] Defs. Ex. B, "Haley Dep." 47-49; 54-57.)  Mr. Haley has served in

a variety of positions, including Regional Transportation Manager, Regional Manager, and Operations Manager for Southern Pacific Railroad, as well as Superintendent and General Manager of the Texas-Mexican Railway.  (Haley Resume.)  From 2000 through the present, Mr. Haley has been a consultant with Strategic Transportation Services.  (Haley Resume.)

Although Mr. Haley is a certified locomotive engineer, he has not operated trains on a regular basis and has never operated a passenger train or a train involved in an accident.  ([Doc. 125] Defs. Ex. A, "Haley Dep." 212-213.)  Mr. Haley received on-the-job training on the use of event recorders to investigate accidents.  (Haley Dep. 134.)  However, Mr. Haley has not attended any training on the specifics of how event recorders work.  (Haley Dep. 134.)

In his January 15, 2007 report, Mr. Haley referenced a list of cases in which he offered testimony.  ([Doc. 125] Def. Ex. A, "Haley Report.")  However, such a list could not be located in the record.  Mr. Haley's resume reflects that he has provided expert testimony supporting a shipper's claim to recover losses resulting from a rail carrier's failure to provide consistent service levels and on hazardous materials regulations, and he has provided litigation support and expert reports on grade crossing accidents.  (Haley Resume.)

In a May 7, 2007 affidavit, Mr. Haley stated that he "provided expert testimony by deposition in both State and Federal Court cases on event recorders and the graphs, analysis and date [sic] tables that they record." ([Doc. 128] Pls. Ex. 3 "May 7, 2007 Affidavit.")  Mr. Haley testified in his deposition that he had been retained as an expert by the City of Muskogee to testify about grade separation at a railroad crossing.  (Haley Dep. 46.)

In his report, Mr. Haley stated that he "will offer an expert opinion as to the quality or standard of care that both the BNSF and Amtrak practiced in identifying, managing and instituting corrective actions at this crossing . . . [and] to deal with unsafe and hazardous conditions at this

12

grade crossing." (Haley Report 2.)

Mr. Haley stated in his report that Mr. Steiner, and possibly Mr. Estep, failed to maintain a close lookout to detect the approaching SUV.  (Haley Report 5.)  Mr. Haley also opined that BNSF and Amtrak were responsible for the actions of the Amtrak crew, and hazardous conditions existed at the North Farm Road crossing.  (Haley Report 5-6.)

Mr. Haley explained in his report that the hazardous conditions consisted of trains operating up to 79 mph where the "approach to the crossing and the height of the grade crossing places the crossing service above the top of the line of sight of a driver observing the road surface in front of the vehicle as they approach the crossing, and the crossing's location in a farming area suggests that much of the traffic is industrial traffic associated with the agricultural businesses in the area." (Haley Report 6.)

According to the Haley Report, based on prior accidents or close calls, the railroads were on prior notice of a hazardous crossing which should have been closed, or the hazardous conditions corrected, and Defendants were negligent in continuing to operate trains at high speeds over the hazardous crossing without taking steps to eliminate or mitigate the hazardous conditions.  (Haley Report 7.)

In his report, Mr. Haley took issue with the event recorders on the train.  Mr. Haley observed in his report that "[e]vent recorder data produced by the railroad is currently only available in the compressed graphical view." (Haley Report at 7.)  At his deposition, Mr. Haley testified that he could not cite to any evidence to suggest that the recorders had not properly recorded the sequence of events leading up to the accident or that the data was intentionally manipulated or altered.  ([Doc. 125] Def. Ex. B, "Haley Dep." 136-138; 139; 237.)  Mr. Haley observed in his report that "[e]vent recorder data produced by the railroad is currently only available in the compressed graphical view."

(Haley Report.)   Mr. Haley did not directly analyze the data from the event recorders; he only reviewed printouts provided by Defendants.  ([Doc. 133] Pls. Ex. A, "May 22, 2007 Affidavit.")

According to Mr. Haley, the event recorder data indicated that the train approached the crossing at 79 mph, closing at the rate of approximately 116 feet per second.  (Haley Report 7-8.)  Mr. Haley's reading of the printouts indicated that Mr. Steiner sounded the locomotive whistle, but that Mr. Steiner may not have sounded the whistle for the required distance, time, or pattern.  (Haley Report 7.)

Mr. Haley opined that Mr. Steiner may have violated an operating rule by failing to sound the whistle 1,320 feet in advance of the crossing.  (Haley Report 8.)  However, Mr. Estep testified in his deposition that Mr. Steiner started sounding the whistle and ringing the bell right at the whistle board, which was 2,500 feet from the crossing.  ([Doc. 75] Def. Ex. B, "Estep Dep. 48.")  According to Mr. Heikkila's reading of the event recorder data, approximately 1,430 feet in advance of the crossing, Mr. Steiner began sounding the whistle and continued to blow the whistle in the normal pattern until the collision.  (Heikkila Report.)

Mr. Haley offers no factual support for his statement that Mr. Steiner failed to sound the whistle 1,320 feet before the crossing.  The "1,320" number apparently originated with his citation to the *General Code of Operating Rules*, which requires sounding of whistle not less than 1/4 mile before the crossing. (Haley Report 7.)

Mr. Haley believed that, if proven that Mr. Steiner sounded the whistle 1,320 feet before the crossing, the decedents would have had only eleven seconds of warning before the locomotive entered the grade crossing.  (Haley Report 8.)  However, the record establishes that the whistle was sounded more than 1,320 feet in advance of the crossing.  Mr. Haley acknowledges that the train was traveling 79 mph, or 116 feet per second.  At that speed, it would have taken 21.55 seconds to travel

14

2,500 feet, consistent with Mr. Estep's testimony, or 12.33 seconds to travel 1,430 feet as indicated by the printouts.

According to Mr. Haley, Defendants provided four separate printouts from event recorders on the locomotives on the train.  (Haley Report 8.)  The printout for the lead locomotive showed a date of March 20, 2000 and a time of 17:36.  (Haley Report 8.)  The printout for the second locomotive showed a date of March 20, 2001 and a time of 14:43.  (Haley Report 8.)  Mr. Haley pointed out that the dates and times on the printouts are both inconsistent with the date and time of the accident and inconsistent with each other.  (Haley Report 8.)  Mr. Haley also observed that the event recorder data for the other two locomotives on the train was not produced.  (Haley Report 8.)  Additionally, the underlying event recorder data, or "data table," was not produced.  (Haley Report 8.)

In his report, Mr. Haley opined that the event recorder data may have been altered or corrupted and is not representative of the train's operation on March 21, 2003.  (Haley Report 8.)  Mr. Haley further opined that it was possible that data would show that Mr. Steiner and Mr. Estep failed to place the train "in emergency" immediately when he saw the SUV on the North Farm Road crossing.  (Haley Report 8.)

At his March 21, 2007 deposition, Mr. Haley testified that he could not cite to any evidence to suggest that the recorders had not properly recorded the sequence of events leading up to the accident or that the data was intentionally manipulated or altered.  (Haley Dep. 36-138; 139; 237.)  Mr. Haley testified in his deposition that he had no proof that the event recorder data was manipulated and acknowledged that the discrepancies could be caused by a computer glitch.  (Haley Dep. 138.)

Mr. Haley acknowledged that Mr. Steiner was documented as having completed the required

training.  (Haley Dep. 71.)  Mr. Haley did not take exception to the classroom training of Mr. Steiner or Mr. Estep.  (Haley Dep. 72.)  Mr. Haley had no information that Mr. Steiner or Mr. Estep were not certified.  (Haley Dep. 73.)

Mr. Haley opined that the crossing should be upgraded with lights and gates.  (Haley Report.)  This opinion is based upon the *Railroad Highway Grade Crossing Handbook*, which specifically provides that it "does not constitute a standard, specification, or regulation" on highway grade crossings.  (Haley Dep. 150; 152.)

Mr. Haley identified the following factors as hazards at the North Farm Road Crossing: (1) high speed train operation combined with limited sight distance, (2) the approach to the crossing and the height of the grade places the crossing surface above or at the top of the line of sight of a driver observing the road surface in front of a vehicle as the driver approaches the crossing, and (3) the location in a farming area suggests that much of the traffic flow is agricultural.  (Haley Report.)

Mr. Haley testified in his deposition that he did not measure any sight lines at the crossing. (Haley Dep. 26; 153; 156-160; 197.)  Mr. Haley observed the sight distance as he approached the crossing in an automobile.  (Haley Dep. 29.)  Mr. Haley obtained no information regarding traffic count data at the crossing.  (Haley Dep. 26-27; 150; 184-185.)  Mr. Haley testified in his deposition that he is not an expert in accident reconstruction and he does not calculate speeds or stopping distances for vehicular traffic or delay time.  (Haley Dep. 86; 102; 109; 182.)

Plaintiffs submitted an affidavit from Mr. Haley, dated April 5, 2007, in support of their Response in Opposition to Defendants' Motion for Summary Judgment (Federal Preemption) and Plaintiffs' Cross Motion for Sanctions.  ([Doc. 88] Pls. Ex. A, "April 5, 2007 Affidavit.")  In the April 5, 2007 Affidavit, Mr. Haley stated that the data from the event recorders is inconsistent with the facts, incorrect, spoiled and unreliable.  (April 5, 2007 Affidavit.)

16

Mr. Haley based this opinion on the inconsistencies between the recorded dates and times and the date and time of the accident. (April 5, 2007 Affidavit.)  Mr. Haley observed that AM-195 traveled 5,243 feet before coming to a stop, while the initial printout for AM-23 traveled 4,637 feet before coming to a stop, a difference of 606 feet.  (April 5, 2007 Affidavit.)

Mr. Haley recounted that additional printouts for these locomotives contained inconsistent dates and times.  (April 5, 2007 Affidavit.)  The additional printouts showed that AM-195 traveled 3,045 feet "after the train was placed in emergency" and that AM-23 traveled 3,028 feet after the train was placed in emergency, a variance of seventeen feet.  (April 5, 2007 Affidavit.)

Mr. Haley opined that the data had been manipulated to reduce the variance and it was unclear how that manipulation had affected the indications speed, distance traveled or the proximity to the crossing in which the whistle was sounded.  (April 5, 2007 Affidavit.)  Based on these discrepancies, Mr. Haley concluded that any attempt to use the data would be futile because the data is incorrect and spoiled.  (April 5, 2007 Affidavit.)

Plaintiffs submitted the May 7, 2007 Affidavit in support of their Response in Opposition to Defendants' Motion for Summary Judgment: Federal Preemption of Claims Regarding Crew Training and Event Recorders and Plaintiffs' Cross Motion for Sanctions.  (May 7, 2007 Affidavit.)

In the May 7, 2007 Affidavit, Mr. Haley pointed out that a federal regulation, 49 C.F.R. § 229.135, requires that the lead locomotive of any train operating in excess of 30 mph must have an operational event recorder.  (May 7, 2007 Affidavit.)  Mr. Haley opined that, since the event recorders were not recording time and speed properly, the train should not have traveled in excess of 30 mph.  (May 7, 2007 Affidavit.)  According to Mr. Haley, if the train had been traveling at 30 mph, the stopping distance would have been 411 feet.  (May 7, 2007 Affidavit.)  Mr. Haley further opined that Defendants had not produced records establishing that Mr. Steiner and Mr. Estep were

properly certified and trained, as required by federal regulations contained in 49 C.F.R. Part 240. (May 7, 2007 Affidavit.)

Plaintiffs submitted the May 22, 2007 Affidavit in support of their Response to Defendants' Motion to Strike. (May 22, 2007 Affidavit.) In the May 22, 2007 Affidavit, Mr. Haley explained that, during his career, he had hands-on training in the downloading, use and analysis of event recorder data and that his training and experience had been put to practical use many times to ascertain the causes of accidents and derailments. (May 22, 2007 Affidavit.)

Mr. Haley acknowledged that he had no formal training on analyzing event recorders. (May 7, 2007 Affidavit.) He further explained that "[m]uch of the use of event recorder data in litigation does not require the expert to analyze the data, but simply to read the data presented in tabular format." (May 22, 2007 Affidavit.) Mr. Haley stated that, using his experience, he can compare the data or multiple event recorders from the same train and detect anomalies that have, in the past, proven the manipulation of data or errors in the recording device. (May 22, 2007 Affidavit.) Mr. Haley stated that the analysis required basic math and problem solving skills and it was evident that the data was incorrect due to the discrepancies in the data. (May 22, 2007 Affidavit.)

Defendants' expert witness concerning train operations, Brian Heikkila,[6] stated in an affidavit that the event recorders operated in accordance with federal regulations. (([Doc.127] Ex. A, "Heikkila Report.") Mr. Heikkila explained that the event recorder data was processed using playback software provided by Wabtec Railway Electronics, which supplies the "Permanent Core Memory" module that is part of the "Integrated Function Control" event recorder system installed by GE, the locomotive manufacturer. (Heikkila Report.) Mr. Heikkila reviewed the printouts and

---

[6] Plaintiffs do not challenge Mr. Heikkila's qualifications. Based on his training and experience, Mr. Heikkila qualifies as an expert witness on event recorders and railroad accidents under Fed. R. Civ. P. 702.

the underlying electronic data and found them to be consistent.  (Heikkila Report.)  Mr. Heikkila

further opined that the event recorder data was accurate and was not altered or corrupted.  (Heikkila

Report.)

Mr. Heikkila stated that the indicated event recorder time is relative and an independent

function on each locomotive.  (Heikkila Report.)  A difference between actual clock time and the

indicated event recorder time does not constitute an inaccuracy in the underlying event recorder

data, and does not imply that the underlying data is incorrect, spoiled, corrupted or manipulated.

(Heikkila Report.)

The data from AM-195 indicates that the train stopped fifty-two seconds after initiation of

emergency braking at time interval 15:38:57, speed was 78 mph (rounded to nearest mph) and

emergency stopping distance was 3160 feet.  (Heikkila Report.)  The data from AM-23 indicates the

train stopped fifty-two seconds after initiation of emergency braking at time interval 15:38:59, the

speed was 79 mph (rounded to nearest mph), and emergency stopping distance was 3,143 feet.

(Heikkila Report.)

According to Mr. Heikkila, the contention that simultaneous speed variation of 5 mph existed

between locomotives AM-195 and AM-23 during the emergency stop are incorrect.  (Heikkila

Report.)  Mr. Heikkila states that the event data must be compared in a proper context within the 52-

second time interval that the stop occurred.  (Heikkila Report.)  When those intervals are properly

compared, the difference in the data between the two locomotives is only 1-2 miles per hour.

(Heikkila Report.)

Locomotive event recorders typically capture axle revolution data.  (Heikkila Report.)  The

event recorder playback software requires "wheel size" information to translate the axle revolution

data into speed and distance traveled.  (Heikkila Report.)  An increase in wheel size translates into

19

a larger wheel circumference which, in turn, results in a greater distance covered with each revolution and hence a higher velocity. (Heikkila Report.) The use of a 39.75 inch wheel size entry in the playback software yields a higher speed and longer stopping distance than the use of the 39 inch default wheel size. (Heikkila Report.) According to Mr. Heikkila, the event recorder data downloaded from the train, and produced in this case, is reliable and accurately recorded train speed, distance traveled, and when the whistle and bell were sounded. (Heikkila Report.)

According to Mr. Heikkila's reading of the event recorder data, approximately 1,430 feet in advance of the crossing, Mr. Steiner began sounding the whistle and continued to blow the whistle in the normal pattern until the collision. (Heikkila Report.)

Approximately 164 feet in advance of the North Farm Road crossing, Mr. Steiner initiated emergency response and train braking. (Heikkila Report.) The stopping distance of the train traveling at 78 mph was approximately 3,160 feet. (Heikkila Report.) If the train were to stop 3,160 feet from the point of impact and avoid a collision entirely, the emergency brakes would have to be applied more than 27 seconds away from the North Farm Road crossing. (Heikkila Report.)

Defendants retained Brian Charles[7] as an expert witness in the field of accident reconstruction. ([Doc.97] Defs. Ex. E, "Charles Report.") The Charles Report places the SUV 15 feet from the train tracks at 3 seconds prior to the collision, and 50 feet from the train tracks at 5 seconds prior to the collision. (Charles Report.)

According to Mr. Charles, the SUV brake lights were not on at the time of impact.[8] (Charles Report.) The SUV had encroached onto the crossing and was approximately 2.5 feet past the west

---

[7] Plaintiffs do not challenge Mr. Charles' qualifications. Based on his training and experience, Mr. Charles qualifies as an expert in accident reconstruction under Fed. R. Civ. P. 702

[8] This opinion is contradicted by Mr. Moya's testimony regarding the state of the vehicle after the accident.

rail when it was struck by the front of the locomotive.  (Charles Report.)  There are no trees, objects, or terrain features that pose an obstruction to visibility of an approaching southbound train.  (Charles Report.)  The tracks are elevated relative to SR 313.  (Charles Report.)  The approach provides a completely wide-open view to the north.  (Charles Report.)

Based on Mr. Charles' calculations, Mr. Haley testified in his deposition that the engineers were under no obligation to take action (*i.e.*, reduce throttle or apply emergency brakes) until the SUV passed the stop sign, which is 15 feet from the railroad tracks.  (Haley Dep. 171-173; 84-85.)  The SUV was traveling at approximately 4 mph, or 5.866 feet per second, meaning approximately 3 seconds or less passed between the time the SUV passed the stop sign and entered the railroad crossing.  (Haley Dep. 125.)  Thus, the engineers had no more than 3 seconds in which to take action to avoid the collision.  (Haley Dep. 88; 98.)

There were two prior accidents at the North Farm Road crossing.  (Haley Dep.)  The first accident occurred in 1976, resulted in no injuries, and involved a vehicle that stalled on the tracks.  (Haley Dep. 186.)  The second accident occurred in 1996.  ([Doc.97] Defs. Undisputed Fact 11.)  At the time of the 1996 accident, the North Farm Road crossing did not have a stop sign; it only had a crossbuck sign.  ([Doc. 86] Pls. Resp. Br., Exs. B and C.)

## II.    Standards.

### A.    Applicable law.

In this diversity case, state law governs substantive issues, while federal law applies to procedural questions.  *Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709, 712 (10th Cir. 2005) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  In applying state substantive law, this Court must follow the most recent decisions of the state's highest court.  *Wade v. Emcasco Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007) (citations omitted).  "Where no controlling state decision

21

exists, the federal court must attempt to predict what the state's highest court would do." *Id.*  In

doing so, this Court may seek guidance from decisions rendered by lower state courts, and "the

general weight and trend of authority" in the relevant area of law.  *Id.*  (internal quotations omitted).

With respect to procedural matters, such as the admissibility of evidence or the propriety of

summary judgment, federal law applies.  *See Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016 (10th

Cir. 2001).

**B.     Admissibility of Expert Testimony.**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  The

party proffering the expert testimony bears the burden of proving by a preponderance of the

evidence that the expert's testimony is admissible pursuant to Rule 702.  *See, e.g.*, *Ralston v. Smith*

*& Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (citations omitted).

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to
understand the evidence or to determine a fact in issue, a witness qualified as an
expert by knowledge, skill, experience, training, or education, may testify thereto in
the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
facts or data, (2) the testimony is the product of reliable principles and methods, and
(3) the witness has applied the principles and methods reliably to the facts of the
case.

Fed. R. Evid. 702.

As interpreted by the Supreme Court, Rule 702 requires that an expert's testimony be both

reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that it will

assist the trier in determining a fact in issue.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579,

589-92 (1993).  To assist in the assessment of reliability, the Court in *Daubert* identified four

nonexclusive factors that a trial court may consider: (1) whether the theory at issue can be and has

been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether

22

there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

The Court has emphasized that this list is neither definitive nor exhaustive and that the district court has wide discretion, both in deciding how to assess an expert's reliability and in making a determination of that reliability. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999). Accordingly, a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions. *Daubert*, 509 U.S. at 595.

The Court has described the district court's role in determining the admissibility of expert opinions as a "basic gatekeeping obligation." *Kumho Tire*, 526 U.S. at 147. The objective of the gatekeeping obligation is "to ensure the reliability and relevancy of expert testimony . . . . to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*.

If the reliability prong is met, the court then considers other non-exclusive factors to determine whether the testimony will assist the trier of fact: (1) whether the testimony is relevant; (2) whether it is within the jury's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness' credibility. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006) (quotations omitted). Essentially, the question is "whether [the] reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593.

The party proffering the expert opinion must demonstrate both that the expert has employed a method that is scientifically sound and that the opinion is "based on facts which enable [the expert]

to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Goebel v. Denver and Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)).

**C.    Summary Judgment Standard.**

Summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). Summary judgment is appropriate "only where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Fuerschbach*, 439 F.3d at 1207 (quoting Rule 56(c)).  The evidence, and all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  If this burden is met, the nonmovant must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citations omitted).  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment.  *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995). The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or

surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Only admissible

evidence may be reviewed and considered on summary judgment. *Gross v. Burggraf Constr. Co.*,

53 F.3d 1531, 1541 (10th Cir. 1995).

**III.    Discussion.**

**A.    Defendants' Motion to Strike Affidavit of Allen Haley and to Exclude Opinions and Defendants' Motion to Strike Second Affidavit of Allen Haley and to Exclude New Opinions.**

**1.    Mr. Haley is not qualified to testify as an expert witness regarding the integrity of data downloaded from the event recorders or the effectiveness of the event recorders.**

Defendants argue that Mr. Haley is not qualified to testify as an expert witness regarding the

integrity of the event recorder data or the effectiveness of the event recorders. Plaintiffs respond that

Mr. Haley qualifies because he has been involved in the railroad industry for the past thirty years.

Rule 702 explicitly provides that expert status may be based on "knowledge, skill,

experience, training, or education." Fed. R. Evid. 702. The Supreme Court has stated that a district

court "may focus upon personal knowledge or experience" of a proffered expert. *Kumho Tire*, 526

U.S. at 150. However, "a witness 'relying solely or primarily on experience' must 'explain how that

experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion,

and how that experience is reliably applied to the facts.' " *United States v. Fredette*, 315 F.3d 1235,

1239 (10th Cir. 2003) (quoting Advisory Committee Note to the 2000 Amendments of Rule 702).

Thus, the proponent of expert testimony must show that the witness' experience, and resultant

specialized knowledge, is sufficiently related to the issues and evidence.

In assessing a witness' qualifications, the dispositive question is whether the issue at hand

is "within the reasonable confines" of the witness' subject area. *Ralston*, 275 F.3d at 970. Where

alleged expertise with regard to other aspects of a field give a proffered expert no special insight into

25

the issues of the case, such alleged expertise does not qualify the witness as an expert.  *Fredette*, 315

F.3d at 1239; *see also Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002) (noting

that expert was not qualified to testify where he attempted to spin limited personal experience as a

consultant into evidence of worldwide product market).

Plaintiffs have not shown how Mr. Haley's experience with railroads forms a sufficient basis

for his opinions concerning the integrity of data downloaded from the event recorder or the

operational effectiveness of the event recorders.  The fact that a witness has general experience in

a field does not necessarily qualify the witness as an expert.  *See LifeWise Master Funding v.*

*Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (affirming exclusion of witness who was not qualified

as an expert); *TK-7 Corp. v. Barbouti*, 993 F.2d 722, 728 (10th Cir. 1993) (same); *Broadcort Capital*

*Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1195 (10th Cir. 1992) (holding that witness with some

general experience and education in the field lacked sufficient qualifications to qualify as expert in

the area).

This concern is underscored by the conflict between Mr. Haley's and the uncontested facts

as noted *supra* at page 14.  The flaws in his report, combined with the fact that Mr. Haley has no

training or experience on the specifics of how event recorders work, establish that Mr. Haley is not

qualified to testify as an expert witness on these subjects.  Mr. Haley's opinion testimony on the

topics of integrity of the event recorder data or the effectiveness of the event recorder is inadmissible

under Rule 702.

> **2.**  **Mr. Haley's opinions regarding the integrity of data downloaded from the event**
> **recorders or the effectiveness of the event recorders is unreliable.**

Mr. Haley's opinions are based on printouts from the event recorders.  Mr. Haley admitted

in his May 22, 2007 Affidavit that he did not directly analyze the data.   While there are

discrepancies in the dates, times and distances on the printouts, it is unclear as to how Mr. Haley arrived at his conclusions that the data is corrupted or that the devices were not functional before the accident.

The touchstone of reliability is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 590; *see also Truck Insurance Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004). The court must reject unsupported speculation as well as testimony that is based on unreliable methodology. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 815-16 (7th Cir. 2004); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir. 1991) (concluding that statistics, "without an analytic foundation, are virtually meaningless.").

Mr. Haley explained in his May 22, 2007 Affidavit that he can compare the data from multiple event recorders from the same train and detect anomalies that have in the past proven to be the manipulation of data or errors in the recording device.  However, Mr. Haley offered no methodology to support his analytical leaps from discrepancies in the printouts to corruption of the data.

"Neither Daubert nor the Federal Rules of Evidence '"require[ ] a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."'" *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*  In this case, the analytical gaps in Mr. Haley's opinions are too broad to satisfy the requirements of *Daubert* and Rule 702.

Mr. Haley's reliance on past instances of manipulation of data in unrelated cases is not probative that Defendants manipulated the data in this case.  Such opinions are pure speculation

27

because they are not based on sufficient facts or data. These opinions must be excluded as unreliable under Fed. R. Evid. 702. *See Gibson v. Norfolk S. Corp.*, 878 F. Supp. 1455, 1460 (N.D. Ala. 1994) (affirming a district court's striking of opinions on whether warning lights and signals were working because the testimony was based solely on conjecture and speculation rather than competent evidence).

Moreover, Plaintiffs acknowledge in their brief that "Mr. Haley was pointing out the obvious" with respect to discrepancies in the information contained in the printouts. (Doc. 133 at 4.) The purpose of expert testimony is to assist the trier of fact with scientific, technical, or other specialized knowledge, not to point out the obvious. *See* Fed. R. Civ. 702. Where expert testimony is offered on an issue that a jury is capable of assessing for itself, it is within the trial court's discretion to exclude such evidence. *Thompson v. State Farm Fire and Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994).

Mr. Haley acknowledged that he employed only basic math and problem solving skills in rendering his opinions concerning the discrepancies in the printouts from the event recorders. The jury can assess the discrepancies using the same types of skills. To the extent that Mr. Haley's opinions are within the jury's common knowledge and experience, they are inadmissible under Rule 702. *See Rodriguez-Felix*, 450 F.3d at 1122.

Plaintiffs have not established that Mr. Haley's opinions concerning the integrity of data downloaded from the event recorders and the effectiveness of the event recorders before the accident are reliable. Mr. Haley's proposed testimony on these subjects does not rest on a reliable foundation and would not assist the jury. Accordingly, Mr. Haley's opinions on these subjects are inadmissible.

3.     **Mr. Haley's opinions concerning the alleged responsibility of BNSF and Amtrak for the actions of the Amtrak crew are inadmissible legal conclusions.**

Rule 704(a) permits expert testimony that "embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a).  However, an expert may not state his opinion as to legal standards, nor may he state legal conclusions drawn by applying the law to the facts.  *Okland Oil Co. v. Conoco, Inc.,* 144 F.3d 1308, 1328 (10th Cir. 1998) (citing *A.E. ex rel. Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991)).  Expert testimony of this type is often excluded on the grounds that it states a legal conclusion, usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury on the law.  *United States v. Simpson*, 7 F.3d 186, 188 (10th Cir. 1993).  Such expert testimony does not assist the jury to "understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

In his report, Mr. Haley stated that both BNSF and Amtrak were legally responsible for the actions of the Amtrak crew.  When an expert merely states an opinion on an ultimate issue without adequately exploring the criteria upon which the opinion is based, the jury is provided with no independent means by which it can reach its own conclusion or give proper weight to the expert testimony.  *Cf. Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1459 (10th Cir. 1987) (expert explained bases for opinion in sufficient detail to allow jury to make independent judgment).

The challenged opinions amount to legal conclusions that might interfere with this Court's function of instructing the jury.  Because the jury will be properly instructed on the legal standards governing liability, Mr. Haley's opinions on this subject are not helpful to the trier of fact.  Thus, Mr. Haley's opinions concerning the alleged responsibility of BNSF and Amtrak for the actions of the Amtrak crew are inadmissible.

### 4.     Mr. Haley's opinions concerning the operation of the locomotive whistle and existence of hazardous conditions at the crossing.

Defendants contend Mr. Haley's opinions on the alleged existence of hazardous conditions

at the crossing and operation of the train whistle are unreliable because they are based on an unauthoritative handbook, they conflict with decisions Mr. Haley made in his capacities as Supervisor of Transportation and General Manager of the Texas-Mexican Railroad, they lack factual foundation, and they fail to account for the conflicting evidence.  None of the grounds advanced by Defendants constitute a valid reason for excluding Mr. Haley's opinions on these topics.  Although I am underwhelmed by the persuasive value of Mr. Haley's opinions, Defendants objections on these points go to weight and not admissibility.

Mr. Haley's resume includes considerable background in railroad operations and safety.  Mr. Haley's work experience adequately qualifies him to testify as an expert on the issue of whether the train crew properly operated the whistle.  With respect to this issue, Mr. Haley's testimony is relevant, likely to assist the trier of fact, and states more than just lay observations.  Thus, Mr. Haley's opinions on whether the train crew properly operated the whistle will not be excluded as unreliable under Rule 702.

Ruling on the admissibility of Mr. Haley's opinions on whether dangerous conditions existed at the crossing that warranted modification of the crossing is reserved pending a *Daubert* hearing.

**5.     The opinions contained in the April 5, 2007 and May 7, 2007 Affidavits that were neither included in Mr. Haley's report, nor addressed at his deposition, are stricken pursuant to Fed. R. Civ. P. 26.**

Defendants move to strike the April 5, 2007 and May 7, 2007 Affidavits to the extent that the Affidavits contain opinions that were neither included in the Haley Report, nor addressed at Mr. Haley's deposition.  Plaintiffs neither moved to supplement the report, nor contradicted Defendants' assertions that the Affidavits contain new opinions that are substantially different from the opinions rendered in the Haley report and addressed at his deposition.

Fed. R. Civ. P. 26(a)(2)(B) requires that an expert witness report "contain a complete

30

statement of all opinions to be expressed and the basis and the reasons therefor" to facilitate discovery. *Id.* "Although Fed. R. Civ. P. 26(e) requires a party to 'supplement or correct' disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Beller ex rel. Beller v. United States*, 221 F.R.D. 696, 701 (D. N.M. 2003) (quotation omitted).

The new opinions contained in the April 5, 2007 and May 7, 2007 Affidavits are substantially different from Mr. Haley's earlier opinions, and, in effect, changed the theory of the case. Plaintiffs submitted the April 5, 2007 Affidavit in support of their Response in Opposition to Defendants' Motion for Summary Judgment (Federal Preemption) and Plaintiffs' Cross Motion for Sanctions. ([Doc. 88] Pls. Ex. A, "April 5, 2007 Affidavit.")

In the April 5, 2007 Affidavit, Mr. Haley explained the basis for his opinion that the data from the event recorders is inconsistent with the facts, incorrect, spoiled and unreliable. (April 5, 2007 Affidavit.) Mr. Haley based this opinion on the inconsistencies between the recorded dates and times and the date and time of the accident. (April 5, 2007 Affidavit.) Mr. Haley observed that AM-195 traveled 5,243 feet before coming to a stop, while the initial printout for AM-23 traveled 4,637 feet before coming to a stop, a difference of 606 feet. (April 5, 2007 Affidavit.)

Mr. Haley recounted that additional printouts for these locomotives contained inconsistent dates and times. (April 5, 2007 Affidavit.) The additional printouts showed that AM-195 traveled 3,045 feet "after the train was placed in emergency" and that AM-23 traveled 3,028 feet after the train was placed in emergency, a variance of seventeen feet. (April 5, 2007 Affidavit.)

Mr. Haley opined that the data had been manipulated to reduce the variance and it was unclear how that manipulation had affected the indications of speed, distance traveled or the proximity to the crossing when the whistle was sounded. (April 5, 2007 Affidavit.) Based on these

discrepancies, Mr. Haley concluded that any attempt to use the data would be futile because the data is incorrect and spoiled.  (April 5, 2007 Affidavit.)

Plaintiffs submitted the May 7, 2007 Affidavit in support of their Response in Opposition to Defendants' Motion for Summary Judgment: Federal Preemption of Claims Regarding Crew Training and Event Recorders and Plaintiffs' Cross Motion for Sanctions.  ([Doc. 128] Pls. Ex. 3 "May 7, 2007 Affidavit.")

In the May 7, 2007 Affidavit, Mr. Haley pointed out that a federal regulation, 49 C.F.R. § 229.135, requires that the lead locomotive of any train operating in excess of 30 mph must have an operational event recorder.  (May 7, 2007 Affidavit.)  Mr. Haley opined that, since the event recorders were not recording time and speed properly, the train should not have traveled in excess of 30 mph.  (May 7, 2007 Affidavit.)  According to Mr. Haley, if the train had been traveling at 30 mph, the stopping distance would have been 411 feet.  (May 7, 2007 Affidavit.)  Mr. Haley further opined that Defendants had not produced records establishing that Mr. Steiner and Mr. Estep were properly certified and trained, as required by federal regulations contained in 49 C.F.R. Part 240. (May 7, 2007 Affidavit.)

Plaintiffs submitted the May 22, 2007 Affidavit in support of their Response to Defendants' Motion to Strike. ([Doc. 133] Pls. Ex. A., "May 22, 2007 Affidavit.")  In the May 22, 2007 Affidavit, Mr. Haley explained that, during his career, he had hands-on training in the downloading, use and analysis of event recorder data and that his training and experience had been put to practical use many times to ascertain the causes of accidents and derailments.  (May 22, 2007 Affidavit.)

Mr. Haley acknowledged that he had no formal training on analyzing event recorders.  (May 7, 2007 Affidavit.)  He further explained that "[m]uch of the use of event recorder data in litigation does not require the expert to analyze the data, but simply to read the data presented in tabular

format." (May 22, 2007 Affidavit.)  Mr. Haley stated that, using his experience, he can compare the

data from multiple event recorders from the same train and detect anomalies that have, in the past,

proven the manipulation of data or errors in the recording device.  (May 22, 2007 Affidavit.)  Mr.

Haley stated that the analysis required basic math and problem solving skills and it was evident that

the data was incorrect due to the discrepancies in the data.  (May 22, 2007 Affidavit.)

"The requirements of the Rule 26(a) are mandatory as to any expert retained to testify.  If

the expert is unable or unwilling to make the disclosures, he should be excluded as a possibility for

retention as an expert witness in the case." *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 681 (D. Kan.

1995).  Plaintiffs have offered no reason why the new opinions contained in the April 5, 2007 and

May 7, 2007 Affidavits were not timely disclosed.

Even more troubling is the fact that the new opinions were unavailable for the March 21,

2007 deposition of Mr. Haley.  Defendants were unable to cross examine Mr. Haley concerning the

bases for the new opinions at his deposition.  Discovery is closed and trial is less than two months

away.  It would be unfair, and in derogation of the full disclosure policy of Rule 26, to allow

Plaintiff to rely on these new opinions.  The Court finds good cause to strike the new opinions

contained in the April 5, 2007 and May 7, 2007 Affidavits that were neither included in the Haley

Report, nor addressed at Mr. Haley's deposition.

### 6.    Mr. Haley's opinions are inadmissible to the extent they are premised on inadmissible evidence under 23 U.S.C. § 409 or 49 U.S.C. § 20903.

Defendants argue that Mr. Haley's opinions are inadmissible to the extent they are premised

on evidence that is inadmissible under 23 U.S.C. § 409.

Section 409 provides:

Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data
compiled or collected for the purpose of identifying, evaluating, or planning the

safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

23 U.S.C. § 409.

The plain language of the statute excludes from evidence all data compiled for purposes of highway and railroad crossing safety enhancement and construction for which a state receives federal funding. Courts have recognized that the underlying intent of the statute is to "facilitate candor in administrative evaluations of highway safety hazards, and to prohibit federally required record-keeping from being used as a tool in private litigation." *Robertson v. Union Pac. R.R. Co.*, 954 F.2d 1433, 1435 (8th Cir.1992) (internal quotations and citations omitted).

The statute precludes an expert from rendering an opinion in court based on materials compiled for the purpose of complying with the federal program of enhancing safety at crossings. *Robertson*, 954 F.2d at 1435. It is reversible error to admit such materials. *Lusby v. Union Pac. R.R. Co.*, 4 F.3d 639, 641 (8th Cir. 1993) (reversible error to admit expert opinion based on reports covered by § 409); *Harrison v. Burlington N. R.R. Co.*, 965 F.2d 155, 159-60 (7th Cir.1992) (mandatory language of § 409 withdraws district court's ordinarily broad discretion in evidentiary matters).

Moreover, 49 U.S.C. § 20903 reads "No part of an accident or incident report filed by a railroad carrier under Section 20901 of this title or made by the Secretary of Transportation under Section 20902 of this title may be used in a civil action for damages resulting from a matter mentioned in the report." 49 U.S.C. § 20903. Section 20902 grants the Secretary of Transportation

authority to investigate accidents resulting in serious injury to an individual or to railroad property, occurring on the railroad line of a railroad carrier.  *See* 49 U.S.C. § 20903.

Plaintiffs submitted a report prepared by the Federal Railroad Administration ("FRA"), dated June 17, 1996 ("1996 FRA Report"), regarding an accident that occurred at North Farm Road crossing on March 5, 1996.  ([Doc. 88] Pls' Ex. G.)  The 1996 FRA Report is covered by Section 20903 because is was prepared by an FRA Railroad Safety Inspector and it concerns the circumstances of the March 5, 1996 accident.  Indeed, each page of the 1996 FRA Report is stamped with a warning that the document is inadmissible.  Certainly, the 1996 FRA Report is inadmissable. Defendants do not identify what additional, if any, reports Mr. Haley relied upon that fall within this statute.  To the extent Mr. Haley relied on documents that are covered by Sections 409 or 20903, his opinions are inadmissible.

From a review of the list of documents relied upon by Mr. Haley in preparing his report, it is not apparent which documents might be covered by the statute.  Defendants are directed to file a motion identifying the documents that they assert are covered by 23 U.S.C. § 409 or 49 U.S.C. § 20903 by August 10, 2007.

**B.**     **Defendants' Motion for Summary Judgment (Federal Preemption).**

**1.**     **Defendants are entitled to summary judgment on Plaintiffs' claims relating to the train's speed.**

The Federal Railroad Safety Act of 1970 ("FRSA") authorizes the Secretary of Transportation to promulgate regulations and issue orders for railroad safety.  *See* 49 U.S.C. § 20101 *et seq*.  Tort claims related to the speed of a train generally are preempted by the FRSA if the train traveled within the speed limit set by federal regulations.  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 675 (1993).

Defendants argue that Plaintiffs have presented no evidence from which a jury could conclude that the speed of the train failed to comply with federal regulations and that any claims relating to the speed of the train are therefore preempted.  Plaintiffs respond that the speed of the train is disputed because the data from the event recorders was spoiled and manipulated and that the conditions at the crossing created a local safety hazard.

Plaintiffs do not dispute that the track on which the accident occurred was classified as Class 4 track under federal regulations, with a maximum allowable operating speed for passenger trains of 80 mph.  ([Doc.88] Pls' Resp. Br. 4; 5; [Doc. 147] Pretrial Order.)  Mr. Steiner and Mr. Estep testified in their depositions that the train was traveling at 79 mph or less before the collision.  The printouts indicate that the  train was traveling 79 mph or less at all relevant times.

In response, Plaintiffs presented no admissible evidence that the train traveled above 79 mph. Instead, Plaintiffs rely on the opinions of Mr. Haley that Defendants manipulated the data from the event recorders as the only support for their assertion that the train traveled in excess of the speed limit for Class 4 track.  As more fully discussed in Section III A 2 herein, Mr. Haley's opinions that the event recorder data was spoiled, altered or manipulated are unsupported and inadmissible under Fed. R. Evid. 702.

Defendants satisfied their initial summary judgment burden in establishing that the train traveled at 79 mph or less at all relevant times.  Plaintiffs have submitted no admissible evidence that the train traveled above 79 mph.  Only admissible evidence may be reviewed and considered on summary judgment.  *Gross*, 53 F.3d at 1541.  Because Plaintiffs have submitted no admissible evidence on this point, Plaintiffs have failed to demonstrate the existence of a disputed issue of fact that the train traveled in excess of the speed limit set by federal regulations at any relevant time.

Generally, tort claims related to the speed of a train are preempted if the train traveled within

the speed limit set by federal regulations. *Easterwood*, 507 U.S. at 675. However, the *Easterwood* Court specifically declined to address the preemptive effect of the FRSA upon claims based upon breaches of related tort law duties, "such as the duty to slow or stop a train in order to avoid a specific, individual hazard." *Easterwood*, 507 U.S. at 675 n. 15.[9] Plaintiffs seek to avail themselves of this exception on the basis of the 1996 accident. ([Doc. 88] Pls. Response Br. 11.)

Notably, the *Easterwood* Court specifically observed that the regulations take into account alignment, curvature, and "hazards posed by track conditions" and federal train speed regulations "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Easterwood*, 507 U.S. at 674-75. Accordingly, a number of district courts have held excessive speed claims preempted by FRSA, even though the plaintiffs identified specific hazards associated with the particular crossing where the accident occurred. *See Herriman v. Conrail, Inc.*, 883 F.Supp. 303 (N.D. Ind. 1995) (hazardous lighting at crossing); *Wright v. Illinois Cent. R.R. Co.*, 868 F.Supp. 183 (S.D. Miss. 1994) (vegetation, grade and angle of crossing, and inadequate warnings); *Earwood v. Norfolk S. Ry. Co.*, 845 F.Supp. 880 (N.D. Ga. 1993) (congested intersection, visibility impaired); *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.*, 844 F.Supp. 1152 (W.D. Tex. 1994) (grade crossing in a high vehicular traffic area which was not equipped with an automatic gate with flashing light signals); *Bowman v. Norfolk S. Ry. Co.*, 832 F.Supp. 1014 (D. S.C. 1993) (crossing used by trucks carrying hazardous materials, heavy traffic, notice of a previous accident).

---

[9] Footnote 15 reads, in pertinent part:
Petitioner is prepared to concede that the preemption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard . . . As respondent's complaint alleges only that petitioner's train was traveling too quickly given the "time and place" . . . this case does not present, and we do not address, the question of FRSA's preemptive effect on such related claims. 507 U.S. at 675 n. 15

Courts have defined the exception as involving a "discrete and truly localized hazard," *Seyler v. Burlington N. Santa Fe Corp.*, 102 F.Supp.2d 1226, 1236 (D. Kan. 2000), that "relates uniquely to the avoidance of a single, specific collision." *O'Bannon v. Union Pac. R.R. Co.*, 960 F.Supp. 1411, 1420 (W.D. Mo. 1977). Therefore, the exception does not apply to claims relating to warning devices, grade, angle, and proximity to highways because all are general conditions of crossings and such factors are amenable to uniform, national standards. *Id*. "Furthermore, [such] defects are already accounted for in the Secretary's regulations governing maximum operational speeds." *Id.*, 960 F.Supp. at 1421 (citation omitted).

Indeed, the exception "logically relates" to avoidance of a particular accident. *See Armstrong*, 844 F.Supp. at 1153. For this reason, notice of a previous accident is insufficient to bring a claim into the purview of the exception. *Bowman*, 832 F.Supp. at 1017. Even a crossing with heavy vehicular traffic without an automatic gate or flashing lights does not constitute a "specific, individualized hazard." *Id*.

The fact that a collision occurred between a train and a vehicle in March 1996 does not render North Farm Road crossing a "specific, individual hazard." Consequently, the exception identified in *Easterwood* is inapplicable. Plaintiffs' claims based on the speed of the train are preempted by FRSA. Defendants are entitled to summary judgment on Plaintiffs' claims relating to the speed of the train.

**2.    Plaintiffs' claims relating to the adequacy of the whistle are preempted.**

Defendants contend that Plaintiffs have no evidence to dispute the proper functioning of the locomotive whistle and Plaintiffs' claims relating to the whistle are preempted. In response, Plaintiffs state that they do not claim that the locomotive whistle was inadequate. ([Doc.88] Pls' Resp. Br. 9.) Indeed, Plaintiffs have stipulated that the whistle complied with federal regulations.

38

([Doc. 147] Pretrial Order.)

A claim alleging that a train's whistle is inadequate is preempted, but a claim alleging that a train crew failed to properly sound a whistle is not. *Anderson v. Wis. Cent. Transp. Co.*, 327 F.Supp.2d 969, 980 (E.D. Wis. 2004). Any claims relating to the adequacy of the whistle are preempted. Plaintiffs' claims that the train crew failed to properly sound the whistle are not preempted.[10]

**C.      Plaintiffs' Cross Motion for Sanctions.**

Plaintiffs request sanctions against Defendants in the form of a jury instruction at trial that any information developed from the event recorder downloads be viewed as favorable to Plaintiffs. In support of this motion, Plaintiffs rely exclusively on the opinions of Mr. Haley that the event recorder data was altered or corrupted. As more fully discussed in Section III A herein, Mr. Haley's opinions concerning the event recorder data are unreliable and inadmissible. Plaintiffs have submitted no admissible evidence that the data was corrupted or altered. Under these circumstances, there is no basis for the sanctions requested by Plaintiffs. Accordingly, Plaintiffs' cross motion for sanctions will be denied.

**D.      Defendants' Motion for Summary Judgment: Federal Preemption of Claims Regarding Crew Training and Train Event Recorders.**

**1.      Claims regarding crew training and train event recorders were neither raised in the pleadings nor included in the pretrial order.**

Defendants assert that Plaintiffs never pleaded these claims. Plaintiffs obliquely concede this point with respect to crew training by acknowledging "[t]o the extent that Plaintiffs raise a claim of negligent training . . . such a claim may be preempted." ([Doc.128] Pls' Response Br. 7.)

---

[10] These claims are addressed in Section III E 1 herein.

39

Plaintiffs do not address this point with respect to the event recorders.

Notably, the Complaint, First Amended Complaint, and Second Amended Complaint do not mention crew training or the event recorders.  In the Pretrial Order, Plaintiffs describe the nature of their case as follows:

> Plaintiffs allege that Defendant Amtrak was negligent in the operation of the Amtrak train and BNSF and Amtrak are liable under premises liability for maintenance of the crossing which caused the wrongful death of Justin Vigil and Jacob Moya on March 21, 2003, such that an award of appropriate punitive damages is also appropriate.  (Pretrial Order 3.)

Rule 15(b) of the Federal Rules of Civil Procedure allows amendment of the pleadings to conform to the evidence under certain circumstances.  *See* Fed. R. Civ. P. 15(b).  The Tenth Circuit has affirmed the application of Rule 15(b) in the summary judgment context.  *See Ahmad v. Furlong*, 435 F.3d 1196, 1200-04 (10th Cir. 2006) (allowing an affirmative defense to be raised for the first time in a summary judgment motion and analogizing the situation to one in which Rule 15(b) would be operative).  Accordingly, the Court may apply Rule 15(b) to the motion *sub judice*.

Federal Rule of Civil Procedure 15(b) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial on these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Fed. R. Civ. P. 15(b).

Rule 15(b) is "intended to promote the objective of deciding cases on their merits rather than

40

in terms of the relative pleading skills of counsel." *Green Country Food Mkt., Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1280 (10th Cir. 2004) (internal quotation omitted). In the face of an objection, however, the complaint may be amended only if the plaintiff files a motion to amend the complaint and the defendant fails to satisfy the court that it will be prejudiced by the amendment. *Id.*, 371 F.3d at 1281. "A court may not sua sponte invoke the second portion of Rule 15(b)." *Id.* (Internal quotation omitted). Defendants have objected. Plaintiffs have not moved to amend. Therefore, amendment of the pleadings would be inappropriate under Rule 15(b).

While Plaintiffs are not entitled to relief under Rule 15(b), the claims may still be considered if the Pretrial Order is liberally construed. The Supreme Court recently articulated the long-standing rule that the final pretrial order supersedes earlier pleadings. *See Rockwell Int'l Corp. v. United States*, ____ U.S. ____, 127 S.Ct. 1397, 1404 (2007). The general statement regarding the nature of Plaintiffs' claims in the Pretrial Order may be liberally construed as encompassing negligence claims relating to negligent crew training and operation of the event recorders. Although Defendants have taken exception to any unpleaded claims included in the Pretrial Order, the Court will so construe the Pretrial Order as encompassing claims relating to crew training and the adequacy of the event recorders because such claims are preempted.

### 2. Any claim that Amtrak negligently trained its crew is preempted.

To the extent that Plaintiffs claim that Amtrak negligently trained its crew, such a claim is preempted. *Union Pac. R. Co. v. Cal. Pub. Util. Comm'n*, 346 F.3d 851, 868 (9th Cir. 2003); *Burlington N. and Santa Fe Ry. Co. v. Doyle,* 186 F.3d 790, 794-96 (7th Cir. 1999); *Mehl v. Canadian Pac. Ry., Ltd.*, 417 F.Supp.2d. 1104, 1117 (D. N.D. 2006); *Sheppard v. Union Pac. R.R. Co.*, 357 F.Supp.2d. 1180, 1189 (E.D. Mo. 2005). Plaintiffs' claims that Amtrak negligently trained Mr. Steiner and Mr. Estep are preempted as a matter of law.

41

Furthermore, Defendants are entitled to summary judgment on this claim based on the facts of record. Mr. Nerkowski stated in an affidavit that Mr. Steiner and Mr. Estep were fully qualified and trained in compliance with FRA regulations. Mr. Nerkowski personally certified both Mr. Steiner and Mr. Estep to serve as engineers for the year in which the accident occurred. In response to this showing, Plaintiffs state that Mr. Haley is unable to determine whether the federal standards were met without training records and programs. Plaintiffs neither state whether they requested such information from Defendants nor specify how training records and programs would refute Mr. Nerkowski's Affidavit.[11]

Defendants satisfied their initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law on the issue of preemption of any claim asserted by Plaintiffs relating to crew training. *See Adler*, 144 F.3d at 671. In response, Plaintiffs were obligated to set forth specific facts from which a rational trier of fact could find for them. Plaintiffs offer only Mr. Haley's conclusory and unsupported conjecture that the FRA training standards might not have been met. Plaintiffs have produced no evidence that Mr. Steiner and Mr. Estep were not trained as required by FRA regulations. Defendants are entitled to summary judgment on any claim asserted by Plaintiffs relating to crew training.

### 3. Any claim concerning the purported defectiveness of event recorders is preempted.

The Locomotive Boiler Inspection Act ("LBIA"), 49 U.S.C.A. § 20701 *et seq.*, completely preempts the field of locomotive equipment. *United Transp. Union v. Foster*, 205 F.3d 851, 860 (5th Cir. 2000) (citing *Napier v. Atl. Coast Line R.R. Co.*, 272 U.S. 605, 613 (1926)). Claims of motorists against railroads arising out of crossing accidents, to the extent they are based on the

---

[11] Plaintiffs took Mr. Nerkowski's deposition on February 8, 2007. ([Doc. 128] Pls. Ex. 5.)

railroad's inadequate equipment, are preempted by the LBIA.  *Marshall v. Burlington N., Inc.*, 720 F.2d 1149 (9th Cir. 1983); *First Sec. Bank v. Union Pac. R.R.*, 152 F.3d 877 (8th Cir. 1998); *Springston v. Consol. Rail Corp.*, 130 F.3d 241 (6th Cir. 1997).  Event recorders are required railroad equipment under federal regulations.  *See* 49 U.S.C. §§ 135; 229.25; and 20137.  Therefore, any claim relating to the adequacy of the event recorders is preempted.

Moreover, Defendants submitted evidence that the event recorders were working properly. In response, Plaintiffs repeat their assertion that the data was altered and corrupted based on the inadmissible opinions of Mr. Haley.  Plaintiffs have produced no admissible evidence in support of their assertion that the event recorders were not working properly.  Defendants are entitled to summary judgment on any claims asserted by Plaintiffs relating to the purported defectiveness of the event recorders.

**E.     Defendants' Motion for Partial Summary Judgment on the Driver's Negligence *Per Se* and on Plaintiffs' Claims that the Train Crew Failed to Maintain a Proper Lookout or Take Action to Avoid the Collision.**

**1. Negligence *Per Se*.**

Defendants argue that the theory of negligence *per se* applies to the actions of Jacob Moya because he failed to "stop, look, and listen" at the crossing as required by N.M. Stat. Ann. § 66-7-341, failed to stop at the stop sign as required by N.M. Stat. Ann. § 66-7-104 (A), and failed to keep a proper lookout as required by N.M. Stat. Ann. § 66-7-330 (B).

While most negligence *per se* claims are against defendants, plaintiffs and plaintiffs' decedents can be found comparatively at fault under the doctrine of negligence *per se*.  *See Apodaca v. AAA Gas Co.,* 134 N.M. 77, 93 n.2, 73 P.3d 215, 231 n.2 (Ct. App. 2003) (citing *Olguin v. Thygesen*, 47 N.M. 377, 387-88, 143 P.2d 585, 592 (1943) and *Jaramillo v. Fisher Controls Co.*, 102 N.M. 614, 625-26, 698 P.2d 887, 898-99 (Ct. App. 1985)).  Accordingly, the doctrine of

43

negligence *per se* may apply to the actions to Jacob Moya.

The New Mexico Supreme Court has adopted the following test to determine whether the doctrine of negligence *per se* applies: (1) there must be a statute prescribing certain actions or defining a standard of conduct, either explicitly or implicitly, (2) the defendant or plaintiff must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent.  *See Apodaca,* 134 N.M. at 93, 73 P.3d at 231 (citing *Archibeque v. Homrich*, 88 N.M. 527, 532, 543 P.2d 820, 825 (1975)).

The first requirement is satisfied by N.M. Stat. Ann. §§ 66-7-341; 66-7-104(A); and § 66-7-330(B). The second requirement is satisfied by the undisputed evidence of record.  Mr. Steiner and Mr. Estep testified in their depositions and Ms. Herrera stated in her affidavit that Jacob Moya did not stop at the stop sign and failed to yield the right-of-way to the train.  Officer Arnold stated in his affidavit that he did not observe any skid marks or tracks in the road surface from the SUV prior to the crossing that would indicate that Jacob Moya attempted to stop.  Plaintiffs have presented no evidence that refutes this showing.  The Decedents and Defendants were in the class of persons sought to be protected by the traffic statutes.  The harm suffered by the Decedents and Defendants was of the type the legislature through the statute sought to prevent.  All four requirements for application of negligence *per se* are satisfied.

In response to Defendants' assertion that Jacob Moya was negligent *per se*, Plaintiffs argue that an FRA report stated that the SUV stopped and then proceeded onto the tracks, Mr. Steiner did not keep his eyes on the SUV as it approached the crossing, Jacob Moya stopped at the crossing out of habit, Officer Arnold's Report is hearsay, a crossbuck sign is not a stop sign, and the train crew failed to keep a proper lookout.

44

The FRA report is not helpful to Plaintiffs.  This report consists of a one-page form and referenced the code corresponding to "stopped and then proceeded" under category 41 entitled "Driver."  ([Doc. 90] Pls. Ex. 1 "Initial 2003 FRA Report.")  Even if it is assumed that Jacob Moya initially stopped at the stop sign, he still proceeded into the path of an oncoming train.  In any event, the Initial 2003 FRA report is inadmissible under 49 U.S.C. § 20903, as discussed in Section III A 6 herein in reference to the 1996 FRA Report.

Plaintiffs contend that the engineers did not watch the SUV as it approached the crossing.  Plaintiffs misstate the testimony.  At the Steiner deposition, Plaintiffs' counsel asked Mr. Steiner: ". . . [I]sn't it likely that from when you first saw the Moya vehicle until the actual impact, there is a time frame where your eyes were actually off of the vehicle just by virtue of the work you were performing?"  Mr. Steiner answered: "For a split second. . . . It was a split second." (Steiner Dep. 97.)  Mr. Steiner did not testify that he did not watch the crossing.  Plaintiffs cite no similar testimony with respect to Mr. Estep.

At the Tabor deposition, Mr. Tabor testified in response to questioning by Plaintiffs' counsel that it would be a rule violation for the engineer to take his eyes off a forward-looking direction even for a split second.  (Tabor Dep. 103-104.)  Plaintiffs seize on this testimony in support of their assertion that Mr. Steiner and Mr. Estep cannot testify as to whether the SUV stopped because they did not keep a proper lookout as the SUV approached the crossing.  Mr. Steiner testified that he may have taken his eyes off the SUV, but he did not testify that he took his eyes off the crossing.

Plaintiffs assert that Mr. Tabor testified in his deposition that the engineers violated the rules and failed to keep a proper lookout.  If Mr. Tabor so testified, copies of such testimony were neither submitted, nor included, in the record herein.  Mr. Steiner and Mr. Estep testified that they watched the crossing the entire time as the SUV approached the crossing.  This is not inconsistent with Mr.

Tabor's testimony that it would be a rule violation for the engineer to take his eyes off a forward-looking direction even for a split second. Misstated testimony is not sufficient to survive summary judgment.

Plaintiffs rely on the affidavit of Juan Moya that it was Jacob Moya's habit to stop at stop signs. Plaintiffs offer this evidence to show that Jacob Moya stopped at the North Farm Road crossing. Defendants argue that the Moya Affidavit is inadmissible.

The admissibility of such evidence is governed by Rule 406, which states:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Fed. R. Evid. 406

Habit "is the person's regular practice of meeting a particular kind of situation with a specific type of conduct." *Sims v. Great American Life Ins. Co.*, 469 F.3d 870, 877 (10th Cir. 2006) (quoting Fed. R. Evid. 406 advisory committee's notes). "In deciding whether certain conduct constitutes habit, courts consider three factors: (1) the degree to which the conduct is reflexive or semi-automatic as opposed to volitional; (2) the specificity or particularity of the conduct; and (3) the regularity or numerosity of the examples of the conduct." *United States v. Angwin*, 271 F.3d 786, 799 (9th Cir. 2001) (citing *Weil v. Seltzer*, 873 F.2d 1453, 1460 (D.C. Cir. 1989); *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293-94 (7th Cir. 1988)).

The Moya Affidavit is insufficient to show habit under Rule 406. Jacob Moya was 15 years old at the time of the accident. The Moya Affidavit includes no indication that Jacob Moya had been driving long enough for any of his actions while doing so to be "reflexive or semi-automatic." Mr. Moya's knowledge of Jacob Moya's driving behavior was limited to instances where Mr. Moya

46

was present in the vehicle or otherwise observing Jacob Moya's driving behavior. The Moya Affidavit contains no reference to what Jacob Moya's regular conduct was when approaching railroad crossings, nor any reference to the North Farm Road crossing in particular. The Moya Affidavit includes no information as to how long Jacob Moya had been driving, how many times he had gone over railroad crossings in general or the North Farm Road crossing in particular, or how he drove when Mr. Moya was not in the vehicle. Hence, the Moya Affidavit is inadmissible under Rule 406.

In further response to Defendants' assertion that the conduct of Jacob Moya constituted negligence *per se*, Plaintiffs object to the Arnold Affidavit on the basis of hearsay.[12] ([Doc. 90] Pls' Br. 10.) With the exception of the paragraph regarding Mike Avila's statement, all of the information in the Arnold Affidavit is either based on personal knowledge or on statements of witnesses whose deposition testimony on the same subject matter has been submitted and included in the record herein. To the extent that the Arnold Affidavit contains information that is the subject of deposition testimony, the deposition testimony, and not the Arnold Affidavit is relied upon herein. The portions of the Arnold Affidavit based on the personal knowledge and observations of Officer Arnold are not hearsay.

Plaintiffs argue that a crossbuck sign is a mere warning device and not a stop sign. Plaintiffs do not dispute that a stop sign was located above the crossbuck sign and that a stop sign required Jacob Moya to stop. Indeed, Plaintiffs have submitted an affidavit and photographs demonstrating this point, ([Doc. 86] Exs. B and C ), and have so stipulated in the Pretrial Order. It is undisputed that a stop sign was located on the same post as the crossbuck sign and required all eastbound traffic

---

[12] Interestingly, Plaintiffs submitted and relied on Officer Arnold's police report. ([Doc. 128] Pls. Ex. 2, Arnold Report.)

approaching North Farm Road crossing to stop.  Moreover, New Mexico law requires drivers to yield to an oncoming train.  Therefore, Plaintiffs' argument that the crossbuck sign did not require Jacob Moya to stop is not helpful to them.

The admissible evidence indicates that Jacob Moya failed to stop and failed to yield to the oncoming train in violation of New Mexico Statutes.  All four prerequisites for application of the doctrine negligence *per se* have been satisfied.  Defendants are entitled to have the jury instructed that Jacob Moya was negligent *per se*.

### 2. Plaintiffs' Claim that the Train Crew Failed to Maintain a Proper Lookout or Take Action to Avoid the Collision.

New Mexico law provides:

[A]n engineer has the right to assume that the driver of an approaching automobile will give the train the right of way, and is not required to bring his train to a standstill simply because the automobile is approaching the track, unless it becomes evident the automobile is proceeding onto the tracks.

*Largo v. Atchison, Topeka & Santa Fe Ry. Co.*, 131 N.M. 621, 629, 41 P.3d 347, 355 (Ct. App. 2001).

Defendants have presented evidence that the engineers watched the crossing as the train and the SUV approached the crossing.  Once it became evident that the SUV was proceeding onto the tracks, Mr. Steiner activated the emergency braking system.  Plaintiffs have not squarely addressed Defendants' arguments on these points, or submitted any admissible evidence refuting Defendants' factual showings.  Construed in the light most favorable to Plaintiffs, the admissible evidence in the record establishes that Defendants are entitled to partial summary judgment on Plaintiffs' claims that the engineers failed to maintain a proper lookout and/or failed to take appropriate action to avoid the collision.

**F.**     **Defendants' Motion for Summary Judgment on Plaintiffs' Negligence and Punitive Damage Claims.**

      **1.**     **Summary judgment is inappropriate on question of whether Mr. Steiner properly operated the whistle.**

Defendants assert that they are entitled to summary judgment on Plaintiffs' claim that Mr. Steiner failed to properly operate the whistle.  ([Doc. 97] Defs' Statement of Undisputed Facts 4-5.; [Doc. 135] Defs. Reply Br. at 3-4.)  Plaintiffs rely on the testimony of Mr. Vigil to dispute this factual assertion.  ([Doc. 126] Pls. Response Br. at 5.)

Mr. Steiner testified in his deposition that he sounded the locomotive whistle as the train approached the North Farm Road crossing and that he continued to sound the whistle repeatedly as he placed the train "in emergency."  Mr. Estep testified in his deposition that Mr. Steiner started sounding the whistle and ringing the bell right at the whistle board, which was 2,500 feet from the crossing.  Ms. Herrera could hear the whistle from approximately a quarter of a mile away from the North Farm Road turnoff.  As the SUV turned east onto North Farm Road, Ms. Herrera could hear the whistle inside her vehicle with the windows closed.  The printouts indicate that the whistle on AM-195 was operated before and after the emergency brakes were applied.  According to Mr. Heikkila's reading of the event recorder data, approximately 1,430 feet in advance of the crossing, Mr. Steiner began sounding the whistle and continued to blow the whistle in the normal pattern until the collision.

Mr. Vigil testified in his deposition that he did not hear the train whistle prior to the impact; he only heard it when the train was on top of the SUV.  Mr. Vigil testified in his deposition that he had gotten into his truck to start it and turn into the pasture gate, when he "looked through the windshield, they [Justin Moya and Jacob Vigil] were on top of the track, and boom, they got hit." ([Doc. 128] Pls. Ex. 3, E. Vigil Dep. 45.)  In addition, Mr. Haley stated in his report that Mr. Steiner

may not have sounded the whistle soon enough.

Defendants argue that the negative testimony of Mr. Vigil that he did not hear the whistle is insufficient as a matter of law to refute the positive testimony of the engineers, Ms. Herrera, and the event recorder data that the whistle was sounded.

Courts have held that testimony concerning failure to hear a train whistle, when in conflict with testimony that other witnesses heard the whistle, is insufficient, under certain circumstances, to create a material issue of fact as to a railroad's negligence. *See Nye v. CSX Transp., Inc.*, 437 F.3d 556, 567 (6th Cir. 2006) (relying on Ohio law); *Bryan v. Norfolk & Western Ry. Co.*, 21 F. Supp. 2d 1030, 1034 (E.D. Mo. 1997) (relying on Missouri law).[13]

The Tenth Circuit has stated:

> Testimony of witnesses merely that they did not hear a whistle or bell is of insufficient probative value to take the issue to the jury when in conflict with positive testimony of other witnesses that the whistle was sounded or the bell rung, unless it further appears from the circumstances, conditions, and surroundings that they were in position to hear and would probably have heard the sound had it been given. *Union Pacific Railroad Co. v. Gaede*, 10 Cir., 110 F.2d 931; *Stephenson v. Grand Trunk Western Railroad Co.*, 7 Cir., 110 F.2d 401, 132 A.L.R. 455; *Kilmer v. Norfolk & Western Railway Co.*, 4 Cir., 45 F.2d 532, *certiorari denied* 283 U.S. 824, 51 S.Ct. 347, 75 L.Ed. 1438; *Bergman v. Northern Pacific Railway Co.*, 8 Cir., 14 F.2d 580. But the value of negative testimony depends upon the surrounding circumstances and conditions. And where it appears that the witnesses giving the testimony were alert and vigilant in watching and listening for approaching trains and were so situated and circumstanced that in all probability they would have heard the sound had it been given, the testimony is sufficient to take the case to the jury on the issue, even though there be positive testimony by other witnesses that they heard the whistle and the bell. *Union Pacific Railroad Co. v. Burnham*, 10 Cir., 124 F.2d 500; *Eiseman v. Pennsylvania Railroad Co.*, 3 Cir., 151 F.2d 222.

*Chicago & N.W. Ry. Co. v. Golay*, 155 F.2d 842, 846 (10th Cir. 1946).

Generally, "[a] witness' statement that he did not hear the train's whistle is of probative

---

[13] Plaintiffs did not address this legal argument. There does not appear to be a New Mexico case on point.

value only if it is shown that a witness: 1) was in close proximity to the track, 2) was in a position to have heard the whistle if sounded, and 3) was attentive to whether the whistle was in fact sounded." *Bryan*, 21 F. Supp. 2d at 1034.  Because the probative value of the statement hinges on the underlying circumstances, it is incumbent on the party proffering such evidence to advocate for its admission in the face of a challenge to its admissibility.  While Plaintiffs have not addressed this point, the following may be gleaned from Mr. Vigil's deposition testimony on file.

As the train and the SUV approached the crossing, Mr. Vigil was on North Farm Road, to the southeast and within sight of the crossing.  The portion of Mr. Vigil's deposition testimony on file suggests that Mr. Vigil may have exited his vehicle to open the pasture gate and he had returned to the inside of his vehicle just prior to the collision.  These factors indicate that Mr. Vigil was close enough to the track and may have been in a position to hear the whistle if it was sounded in the seconds leading up to the crash.  Mr. Vigil did not state in his deposition whether he was attentive to whether the whistle was sounded.

These circumstances, combined with Plaintiffs' lack of advocacy on this crucial point, create a close question.  However, construed in the light most favorable to Plaintiffs, I believe that Mr. Vigil's testimony is sufficient to create a jury question on whether Mr. Steiner properly operated the whistle.  This conclusion is underscored by Mr. Haley's opinion that Mr. Steiner may not have sounded the whistle as soon as he should have sounded it.

As the Eleventh Circuit noted in the *Easterwood* case:

> While generally positive testimony (such as I heard the whistle) is better than negative testimony (such as I did not hear the whistle) the district court may not accept positive testimony to the exclusion of negative testimony on a motion for summary judgment.  It is a credibility question whether one witness' memory is more reliable than another witness' memory, and such credibility determinations are not to be made on a motion for summary judgment.

51

*Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1560 n.14 (11th Cir. 1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Viewed in the light most favorable to Plaintiffs', Mr. Vigil's testimony and Mr. Haley's opinions are sufficient to create a jury question as to whether Mr. Steiner properly operated the whistle. Plaintiffs have presented sufficient evidence to withstand summary judgment on this claim.

### 2. The engineers' operation of the emergency braking system was not the proximate cause of the accident.

Defendants argue that once the engineers became aware that the SUV was not going to stop at the stop sign, it was too late to avert the collision. Plaintiffs do not directly respond to this argument. Rather, Plaintiffs state that Mr. Steiner took his eyes off the crossing for a split second, Defendants did not produce documents from which Mr. Haley could confirm the crew was properly trained, the train should not have been traveling in excess of 30 mph because the event recorders were out of service, Defendants should have known the crossing was extra hazardous, the 1996 accident happened at the same crossing, and Defendants failed to properly maintain the right-of-way.

Under New Mexico law, "a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 134 N.M. 43, 47-48, 73 P.3d 181, 185-86 (2003). "The proximate causation element . . . is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Id*, 134 N.M. at 48, 73 P.3d at 186.

New Mexico law further provides:

[A]n engineer has the right to assume that the driver of an approaching automobile will give the train the right of way, and is not required to bring his train to a standstill

simply because the automobile is approaching the track, unless it becomes evident
the automobile is proceeding onto the tracks.

*Largo*, 131 N.M. at 629, 41 P.3d at 355.  Under the facts of record, the engineers had the right to

assume that Jacob Moya, the driver of the SUV, would give the train the right-of-way.

Indeed, Mr. Haley testified in his deposition that the engineers were under no obligation to

initiate emergency braking until the SUV passed the stop sign, which was 15 feet from the railroad

tracks.  The SUV was traveling at approximately 4 mph, or 5.866 feet per second, meaning

approximately 3 seconds or less passed between the time the SUV passed the stop sign and entered

the railroad crossing.  Thus, the engineers had no more than 3 seconds in which to take action to

avoid the collision.  Approximately 164 feet in advance of the North Farm Road crossing, Mr.

Steiner initiated emergency braking.  The stopping distance of the train traveling at 78 mph was

approximately 3160 feet.

If the train were to stop 3160 feet from the point of impact and avoid a collision entirely, the

emergency brakes would have to be applied more than 27 seconds away from the North Farm Road

crossing.  The Charles Report places the SUV 15 feet from the train tracks at 3 seconds prior to the

collision, and 50 feet from the train tracks at 5 seconds prior to the collision.  By the time the

engineers realized that the SUV was not going to stop at the stop sign, it was too late for them to

stop the train.  For these reasons, the engineers' operation of the emergency braking system was not

the proximate cause of the accident.

While proximate cause is generally a question of fact for the jury, *Herrera*, 134 N.M. at 47-

48, 73 P.3d at 185-86, "[a] court may decide questions of negligence and proximate cause, if no

facts are presented that could allow a reasonable jury to find proximate cause[.]" *Id.* (quoting

*Calkins v. Cox Estates*, 110 N.M. 59, 65 n. 6, 792 P.2d 36, 42 n. 6 (1990)).  Here, Plaintiffs have

submitted no admissible evidence that the actions of the engineers in the operation of the emergency braking system were the proximate cause of the accident.

**3.    The evidence of record does not support punitive damage awards against Defendants.**

Defendants contend that Plaintiffs' claim for punitive damages is unsupported.  In response, Plaintiffs submit that "the operation of a railroad train without a safely trained crew, with an out of service event recorder over a crossing with an accident history such as the one at North Farm Road is a dangerous activity."  ([Doc. 126] Pls. Response Br. 10.)

New Mexico law permits an award of punitive damages "to punish and deter persons from conduct manifesting a culpable mental state."  *Paiz v. State Farm Fire & Casualty Co.*, 118 N.M. 203, 211, 880 P.2d 300, 308 (1994) (internal quotation omitted).   Punitive damages may be appropriate where a defendant's conduct was malicious, willful, reckless, wanton, fraudulent or in bad faith.   NMRA, Civ. UJI 13-1827.   Punitive damages may not be predicated solely on gross negligence; there must be evidence of an "evil motive" or a "culpable mental state."   *Paiz*, 118 N.M. at 211, 880 P.2d at 308.

Plaintiffs have produced no evidence that the conduct of Amtrak supports an award of punitive damages.   Defendants demonstrated that the crew was properly trained and the event recorders were operating at the time of the crash.   In response, Plaintiffs produced no admissible evidence that the crew was not trained as required by FRA regulations or that the event recorders were out of service.   Notably, Plaintiffs have produced no evidence that would indicate an evil motive or culpable mental state on the part of Amtrak.

Plaintiffs' claim that the two prior accidents at North Farm Road crossing support an award of punitive damages against both Defendants is legally unsupported.   Plaintiffs have submitted no

authority for their contention that two prior accidents over a period of several decades supports a

claim for punitive damages against Defendants.  Under these circumstances, Defendants are entitled

to summary judgment on Plaintiffs' claim for punitive damages.

> **4.   Evidence of the 1996 accident may be admissible, but it does not necessarily establish that the North Farm Road crossing was dangerous.**

Defendants argue that the 2003 accident materially differed from the 1996 accidents because

a stop sign had been installed, where there was no stop sign at the time of the prior accidents.

Plaintiffs point out that the presence of a cross buck sign and the rail road crossing required a driver

in 1996 to yield to an oncoming train.

Evidence of similar accidents involving the same product is admissible under federal law to

establish notice, the existence of a defect, or to refute testimony given by a defense witness that a

given product was designed without safety hazards.  *Robinson v. Missouri Pacific R. Co.*, 16 F.3d

1083, 1089-90 (10th Cir. 1994) (internal quotations omitted).  Generally, the admission of evidence

"regarding prior accidents or complaints is predicated upon a showing that the circumstances

surrounding them were substantially similar to those involved in the present case." *Ponder v.

Warren Tool Corp.*, 834 F.2d 1553, 1560 (10th Cir. 1987) (internal quotations omitted).  The

proponent of the evidence has the burden of establishing substantial similarity.  *See id.*

In *Ponder*, the Tenth Circuit discussed the admissibility of evidence offered to prove

negligence as well as to establish "notice" of an existing dangerous condition:

> In determining whether accidents are "substantially similar," the factors to be
> considered are those that relate to the particular theory underlying the case.
> Differences in the nature of the defect alleged may affect a determination whether
> the accidents are substantially similar.  Moreover, "[h]ow substantial the similarity
> must be is in part a function of the proponent's theory of proof." "If dangerousness
> is the issue, a high degree of similarity will be essential . . .. If the accident is offered
> to prove notice, a lack of exact similarity of conditions will not cause exclusion
> provided the accident was of a kind which should have served to warn the

defendant." When evidence of other accidents is used to prove notice or awareness of a dangerous condition, the rule requiring substantial similarity of those accidents to the one at issue should be relaxed. Once a court has determined that accidents are substantially similar, "[a]ny differences in the circumstances surrounding those occurrences go merely to the weight to be given the evidence."

*Ponder*, 834 F.2d at 1560 (citations, including those of quoted material, omitted).

The dangerous nature of the crossing is the primary and dispositive issue in this case. Accordingly, a high degree of similarity is essential. The 1996 accident involved a pick up truck that traveled south on SR 313, turned east onto North Farm Road, proceeded slowly onto the crossing, and was hit by an Amtrak train during daylight hours. ([Doc. 88] Pls. Ex. H "1999 Charles Report.") At the time of the 1996 accident, all drivers were required to yield to an oncoming train. (*Id.*) The fact that a stop sign was installed after the prior accident goes to weight and not admissibility. Given the substantial similarity between the 1996 accident and the 2003 accident, evidence of the 1996 accident is admissible, subject to the requirements of the Federal Rules of Evidence.

**5.     Summary judgment is inappropriate on Plaintiffs' claim that Defendants should have installed lights or gates at the crossing.**

According to the Haley Report, based on prior accidents, the railroads were on notice of a hazardous crossing which should have been closed or the hazardous conditions corrected, and Defendants were negligent in continuing to operate trains at high speeds over the hazardous crossing without taking steps to eliminate or mitigate the hazardous conditions. Defendants point out that Mr. Haley admitted that he obtained no information regarding traffic count data, had no actual information what agricultural vehicles use the crossing, and admitted that he did not actually measure any sight lines at the crossing.

Plaintiffs have submitted the opinions of Mr. Haley that hazardous conditions existed at the

56

crossing and that Defendants were negligent in continuing to operate high speed trains without installing lights and gates.  In Section III A herein, I reserved ruling on the admissibility of these opinions pending a *Daubert* hearing.  Summary judgment is inappropriate at this time on this question.

**6.    Plaintiffs' claims relating to closure and maintenance of North Farm Road.**

Defendant BNSF has moved for summary judgment on Plaintiffs' claims relating to closure and maintenance of North Farm Road on the grounds that it was unable to unilaterally close the North Farm Road and it was not responsible for maintaining the road.

Plaintiffs did not plead these claims.  Defendants object to any claim of "premises liability" in the Pretrial Order.  Plaintiffs have not formally moved to amend as required by Rule 15(b).

 Defendant BNSF has submitted evidence that the North Farm Road crossing is within the Pueblo of Sandia.  A railroad right-of-way bisecting Sandia Pueblo was recognized by the Pueblo Lands Board in the Pueblo Lands Board Report of 1928.  ([Doc. 97] Def. Ex. G.)  Defendant BNSF argues that it lacks authority to close North Farm Road and cut off Sandia's implied right of access to the land to the east of the crossing.  Plaintiffs responded that Defendant BNSF did not show that it had requested cooperation from Sandia Pueblo in closing the crossing.  Plaintiffs failed to submit any evidence or legal authorities refuting Defendants' assertions on this point.

Plaintiffs contend that the presence of potholes near the crossing contributed to the accident. Defendants have submitted evidence that Sandia Pueblo was responsible for maintenance of North Farm Road up to the planks of the crossing.  ([Doc. 135] Defs. Ex. I.)  Plaintiffs have submitted no evidence that Defendant BNSF is responsible for maintenance of North Farm Road.  Moreover, Plaintiffs have failed to explain how potholes could have been the proximate cause of the accident where the undisputed evidence establishes that Jacob Moya drove into the path of the oncoming

train.

Defendants submitted evidence that Defendant BNSF was neither able to close the North Farm Road crossing, nor responsible for maintenance of the North Farm Road. Plaintiffs have submitted no evidence, or authority, for their contentions that Defendant BNSF had the ability to close the crossing or the responsibility to maintain North Farm Road. Under these circumstances, Defendants are entitled to summary judgment on these points.

**G.      Defendants' Objections to Plaintiffs' Designation of Claims in the Pretrial Order.**

In Plaintiffs' Response to Defendants' Objections to Plaintiffs' Designation of Claims and Witnesses in the Pretrial Order (Doc. 176), Plaintiffs specified claims relating to the question of whether the crossing should have been modified and spoliation of evidence. Plaintiffs have not formally moved to amend as required by Rule 15(b). If the spoliation claim relates to the event recorder data, the Court has herein determined that Defendants are entitled to summary judgment on that issue. Discovery has been conducted on the question of whether the crossing should have been modified. Plaintiffs' recitation of their claims in response to Defendants' objections are encompassed by the issue of whether the crossing should have been modified. To this extent, Defendant's Objections are overruled.

**IV.     Conclusion.**

Mr. Haley's opinions regarding the integrity of data downloaded from the event recorders, the effectiveness of the event recorders, and the alleged responsibility of BNSF and Amtrak for the actions of the Amtrak crew are inadmissible under Rule 702. Mr. Haley's opinions of whether the train crew properly operated the whistle are admissible under Rule 702. A ruling on the admissibility of Mr. Haley's opinions on whether dangerous conditions existed at the crossing that warranted modification of the crossing is reserved pending a *Daubert* hearing. The opinions of Mr.

Haley contained in the April 5, 2007 and May 7, 2007 Affidavits that were neither included in Mr. Haley's report, nor addressed at his deposition, are stricken pursuant to Rule 26. Defendants are directed to file a motion identifying the documents that they assert Mr. Haley relied upon that are covered by 23 U.S.C. § 409 by August 10, 2007. Defendants' request for costs is denied at this time, subject to renewal at the conclusion of this litigation.

Defendants are entitled to summary judgment on Plaintiffs' claims relating to the train's speed, the adequacy of the whistle and any claims relating to crew training and operation of the event recorders. Plaintiffs are not entitled to sanctions based on corruption, alteration, or spoliation of the event recorder data. Defendants are entitled to have the jury instructed that Jacob Moya was negligent *per se* and partial summary judgment on Plaintiffs' claims that the engineers failed to maintain a proper lookout or take action to avoid the collision. Defendants are entitled to partial summary judgment that the engineers' operation of the emergency braking system was not the proximate cause of the accident, on Plaintiffs' claims for punitive damages and on Plaintiffs' claims that Defendants had authority to close the North Farm Road crossing or the responsibility to maintain North Farm Road. Defendants are not entitled to summary judgment on the issues of whether the engineers properly operated the whistle. Ruling is reserved on the question of whether dangerous conditions existed at the crossing that warranted modification of the crossing pending resolution of the question of the admissibility of Mr. Haley's opinions on this issue. Evidence concerning the 1996 accident at the crossing is admissible subject to the requirements of the Federal Rules of Evidence. Defendants' objection to the Pretrial Order is addressed by stipulated order or overruled as more fully described herein.

**WHEREFORE,**

      **IT IS ORDERED** that Defendants' Motion to Strike Affidavit of Allen Haley and Exclude

Opinions (Doc. 124), filed on May 7, 2007, is **GRANTED** as to Mr. Haley's opinions regarding the integrity of data downloaded from the event recorders, the effectiveness of the event recorders, the responsibility of BNSF and Amtrak for the actions of the Amtrak crew, and **DENIED** as to Mr. Haley's opinions concerning whether the train crew properly operated the whistle. A decision on the admissibility of Mr. Haley's opinions on whether dangerous conditions existed at the crossing that warranted modification of the crossing is **RESERVED** pending a *Daubert* hearing.

       **IT IS FURTHER ORDERED** that Defendants' Motion to Strike Second Affidavit of Allen Haley and to Exclude New Opinions (Doc. 136), filed on May 24, 2007, is **GRANTED.**

       **IT IS FURTHER ORDERED** that Defendants shall file a motion identifying the documents that are allegedly covered by 23 U.S.C. § 409 and 49 U.S.C. § 20903 by **AUGUST 10, 2007.**

       **IT IS FURTHER ORDERED** that Defendants' request for costs is **DENIED AT THIS TIME,** subject to renewal at the conclusion of this litigation.

       **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Federal Preemption) (Doc. 74), filed on March 9, 2007, is **GRANTED** as to plaintiffs' claims relating to the train's speed and the adequacy of the whistle, and **DENIED** as to claims that the engineers failed to properly sound the whistle.

       **IT IS FURTHER ORDERED** that Plaintiffs' Cross Motion for Sanctions Against Defendants (Doc. 89), filed on April 6, 2007, is **DENIED.**

       **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment: Federal Preemption of Claims Regarding Crew Training and Train Event Recorders (Doc. 99), filed on April 9, 2007, is **GRANTED.**

       **IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on the Driver's Negligence *Per Se* and on Plaintiffs' Claim that the Train Crew Failed to Maintain a

Proper Lookout or Take Action to Avoid the Collision (Doc. 72), filed on March 9, 2007, is **GRANTED.**

   **IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Plaintiffs' Negligence and Punitive Damage Claims (Doc. 96), filed on April 9, 2007, is **GRANTED** on Plaintiffs' claims for punitive damages and Plaintiffs' claims that Defendants had authority to close the North Farm Road crossing or the responsibility to maintain North Farm Road and **DENIED** on the issue of whether the train crew properly operated the whistle.   A decision on whether dangerous conditions existed at the crossing that warranted modification of the crossing is **RESERVED** pending resolution of the question of the admissibility of Mr. Haley's opinions on this issue.

   **IT IS FURTHER ORDERED** that evidence concerning the 1996 accident is **ADMISSIBLE**, subject to the requirements of the Federal Rules of Evidence.

   **IT IS FURTHER ORDERED** that Defendants' Brief in Support of Their Objections to Plaintiffs' Designation of Claims and Witnesses in the Pretrial Order (Doc. 159), filed on July 3, 2007, is **ADDRESSED BY A STIPULATED ORDER** filed contemporaneously herewith and otherwise **OVERRULED AS MORE FULLY DESCRIBED HEREIN.**


_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**